RECEIVED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
JAN 19 2021
JEFFREY P. COLWELL
CLERK

| COMPLAINT OF DISCRIMINATION | EEOC Complaint No. |
|---|---|
| The Privacy Act of 1974 affects this form. See Privacy Act Statement before completing this form. | CCRD Complaint No. E2000007763 |

### COLORADO CIVIL RIGHTS DIVISION AND EEOC

| Name *(Complainant)* Suzarah Dorleus | | (Area Code) Telephone (407) 755-7649 |
|---|---|---|
| Street Address 9888 E. Vassar Drive | City, State, and Zip Code Denver, CO 80231 | County Denver |

The Employer, Labor Organization, Employment Agency, Apprenticeship Committee, State or Local Government Agency who discriminated against me is:

| Name *(Respondent)* Comcast Cable Communications, LLC | Number of Employees 15+ | (Area Code) Telephone (303) 892-1111 |
|---|---|---|
| Street Address 7250 S. Havana Street | City, State, and Zip Code Centennial, CO 80112 | County Arapahoe |

| Discrimination Based on: Disability (Physical + Mental); Retaliation | Date Most Recent Discrimination Occurred: December 17, 2019 |
|---|---|

**I.  Jurisdiction:** The Colorado Civil Rights Division has jurisdiction over the subject matter of this charge and the named Respondent, pursuant to the provisions of the Colorado Revised Statutes (C.R.S. 1973, 24-34-301, *et. seq.*), as reenacted.

**II.  Personal Harm:** On or about October 14, 2019, and thereafter, I was harassed and refused a reasonable accommodation based on my disability (arm impairment; bipolar disorder; anxiety). On or about December 17, 2019, I was discharged based on my protected class and/or in retaliation for engaging in protected activity.

**III.  Respondent's Position:** Unknown.

**IV.  Discrimination Statement:** I believe I was unlawfully discriminated against because: of my protected class and/or in retaliation for engaging in protected activity in violation of the Colorado Anti-Discrimination Act (CADA). 1.) I began employment with the Respondent on or about September 26, 2019, I performed my job duties satisfactorily at all times, and my most recent job title was Customer Care Representative. 2.) On or about October 14, 2019, the Respondent provided me with disability accommodation request procedures and instructed that I was to enter the request through a third-party company, Sedgwick. 3.) On or about October 22, 2019, I engaged in protected activity when I submitted my accommodation requests via Sedgwick, as instructed by the Respondent. 4.) Thereafter, while my accommodation requests were pending approval, I was harassed by my Trainer, Dawna Williams ("Williams"), including when she would: (i) discuss my medical issues with other coworkers; (ii) complain that I was taking too many days off from work, even though my time-off was approved by the Respondent; and (iii) make rude comments about the way that I have to put my jacket on, which is the result of my physical impairment. 5.) On or about November 21, 2019, I engaged in protected activity when I filed a complaint with the Respondent regarding William's harassment. 6.) On or about December 11, 2019, I was in a meeting with Supervisor, Rob Albers ("Albers"), who warned me that I was "on thin ice," which I believe was in retaliation as Albers and Williams were close friends. 7.) On or about December 16, 2019, I missed work as I had to seek urgent medical treatment for a viral infection. 8.) On or about December 17, 2019, I was discharged, purportedly due to attendance violations. 9.) Prior to my discharge, the Respondent had assured me that once Sedgwick approved my accommodation

requests, any attendance issues or violations that I had experienced would be resolved; however, my accommodation requests submitted through Sedgwick were never approved prior to my discharge. 10.) I believe that I was discriminated against based on my protected class and/or in retaliation for engaging in protected activity.

**V.    WHEREFORE:**  The Complainant prays that the Colorado Civil Rights Division grant such relief as may exist within the Division's power and which the Division may deem necessary and proper.

I want this charge filed with both the Equal Employment Opportunity Commission and the State or local agency, if any.  I will advise the agency if I change my address or telephone number, and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.


Date                              Charging Party/Complainant (Signature)



**COLORADO**
Department of
Regulatory Agencies
Colorado Civil Rights Division

Charge No. E2000007763

Suzarah Dorleus
9888 E Vassar Drive
Denver, CO 80231

Complainant

Comcast Business
7250 S Havana Street
Centennial, CO 80112

Respondent

## DETERMINATION

### Jurisdiction

Under the authority vested in me by C.R.S. 24-34-306(2), I conclude from our investigation that there is insufficient evidence to support the Complainant's claims of discrimination.  As such, a **No Probable Cause** determination is hereby issued.

The Respondent is an employer within the meaning of C.R.S. 24-34-401(3), as re-enacted, and the timeliness and all other jurisdictional requirements pursuant to Title 24, Article 34, Parts 3 and 4 have been met.

The Respondent is one of the nation's largest video, high-speed internet, and phone providers to residential and business customers. The Respondent operates within the State of Colorado, and employs more than 15 people. The Complainant began work on or about October 7, 2019, as a Customer Accountant Executive at the Respondent's Customer Service Call center.

### Allegations and Defenses

The Complainant alleges that on or about October 14, 2019, she was harassed and refused a reasonable accommodation based on her disability (arm impairment; bipolar disorder; anxiety). On or about December 17, 2019, she was discharged based on her protected class and/or in retaliation for engaging in protected activity.

The Respondent denies the Complainant's allegations of discrimination and retaliation and avers that they went to great lengths to accommodate her accommodation requests. The Respondent also states that the Complainant was discharged for legitimate business reasons, namely, her numerous absences during her training period and in violation of their attendance policies.

1

## Relevant Policies and Comparative Data

The Respondent maintains an Equal Employment Opportunity ("EEO") policy, which states:

> [The Respondent's] policy is to provide equal employment opportunities to, and prohibit discrimination against, all applicants and employees without regard to race, color, religion, creed, gender, gender identity or expression, transgender status for those who are transitioning or have transitioned, age, national origin or ancestry, ethnicity, citizenship or immigration status, disability, sex, sexual orientation, marital status, pregnancy, veteran status, membership in the uniformed services, genetic information, or any other basis protected by applicable law ("protected characteristics"), which protections shall also cover the perception that an individual has a protected characteristic or associates with a person who has or is perceived as having a protected characteristic, to the extent required by law. This policy of equal opportunity covers all aspects of the employment relationship, including the application and hiring process, corrective action, promotion and transfer, selection for training opportunities, compensation, termination and the application of service, retirement and employee benefit plan policies. Consistent with this policy, [the Respondent] is committed to making employment decisions based on merit, qualifications, business needs, and other job-related criteria without regard to an individual's actual or perceived protected characteristic(s). Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated. Complaints brought under this policy are covered by the company's Anti-Retaliation Policy.

The Respondent maintains a Harassment policy. This policy states:

> [The Respondent] is strongly committed to providing a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in an environment free of sexual harassment and other forms of unlawful harassment. Accordingly, [the Respondent] prohibits the harassment of its employees by other employees, managers, vendors, contractors, customers, and other third parties doing business with the company based on any protected characteristic (as defined in our EEO policy), including the perception that an individual has a protected characteristic or is associated with a person who has or is perceived as having a protected characteristic. Harassment in violation of this policy may exist when an individual is subjected to unwelcome conduct, whether verbal, physical or visual, based on an

2

actual, perceived or associational protected characteristic, and the conduct has the effect of unreasonably interfering with the individual's job performance or creating an intimidating, hostile or offensive work environment, is made either explicitly or implicitly a term or condition of employment, or where submission to such conduct is used as the basis for an employment decision. [The Respondent's] policy against harassment applies even when the underlying behavior is inappropriate or disruptive in the workplace, but does not rise to the level of harassment under the law. Behavior in violation of this policy may include: making epithets, slurs, ridiculing comments, or statements that reflect negative stereotyping; engaging in threatening, intimidating or hostile acts based on a protected characteristic; and/or displaying or transmitting written or graphic materials that denigrate or show hostility or aversion toward an individual or group (including through email or any electronic form) based on a protected characteristic. In addition to the types of behavior listed above, inappropriate or harassing behavior of a sexual nature in violation of this policy may also include: making unwanted sexual advances; engaging in unwelcome visual, verbal, or physical conduct of a sexual nature, including touching, leering or making sexual gestures; requesting sexual favors; conditioning employment, a tangible job benefit, or an employment decision on submission to a sexual advance or favor; threatening or engaging in retaliation after a negative response to a sexual advance or request for sexual favors; asking out an individual when it is clear or after it becomes clear that the overture is unwelcome; making sexually suggestive jokes, derogatory or sexually degrading comments, or comments about an individual's body or appearance; composing or transmitting sexually suggestive jokes, drawings, letters, or notes, whether by hand, electronically or otherwise; or displaying sexually suggestive objects, pictures, magazines, cartoons, posters, or other materials anywhere in the work place, including on a computer or other mobile device...

The Respondent maintains a Reasonable Accommodation Policy. This policy states:

At times, qualified individuals with disabilities may need a reasonable accommodation in order to perform the essential functions of their position. [The Respondent] is ready and willing to discuss requests for reasonable accommodations that will enable an employee to perform his/her essential job functions. There are many forms of assistance that may be available to employees who may have such a need due to a disability. [The Respondent's] practice is to engage in an interactive dialogue with an employee requiring assistance (and/or the employee's health care provider, as permitted by applicable law) in order to determine if and what kind of accommodation is needed. If you need an accommodation, please contact either your Human Resources Representative or Sedgwick (Comcast's third party accommodations

3

request administrator) at 855-473-7830 to initiate the interactive dialogue … Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated. Complaints brought under this policy are covered by the company's Anti-Retaliation Policy.

The Respondent maintains an Anti-Retaliation policy. This policy states:

[The Respondent] strictly prohibits any form of retaliation against an employee who in good faith makes a complaint, raises a concern, provides information or otherwise assists in an investigation or proceeding regarding any conduct that he or she reasonably believes to be in violation of [the Respondent's] Code of Conduct or policies (including, without limitation, the EEO Policy, Harassment Policy or Reasonable Accommodation Policy), or applicable laws, regulations or contracts. [The Respondent] prohibits employees from being retaliated against even if their underlying complaint is eventually unsubstantiated, unless the employee knowingly made a maliciously false allegation, knowingly provided maliciously false or misleading information in the course of an investigation, or otherwise acted in bad faith. This policy is designed to ensure that all employees feel comfortable speaking up when they see or suspect unlawful or unethical conduct (and/or when they participate in an investigation relating to such concerns) without fear of retaliation. No employee should be discharged, demoted, suspended, threatened, harassed, intimidated, coerced, or retaliated against in any other manner as a result of his or her making a good faith complaint (or assisting in good faith in the handling or investigation of a complaint).

The Complainant signed paperwork indicating that she received the Respondent's Employee Handbook on or about November 14, 2019.

The Respondent's National Call Center has its own Attendance Policy. For new hires, the policy is strict.  During the first 90 days of employment the attendance policy is as follows:

Reliable attendance is especially crucial during your new hire introductory period, and therefore, more heightened standards for attendance apply. During this time, you will participate in a comprehensive training program to learn about the tools and resources needed to do your job. You will meet regularly with your leader to discuss attendance, conduct, and performance. The expectation is that you will be at work on time each day of your introductory period. During the training and nesting periods, those using the On-Track performance management program (if applicable to your function) or another performance management system

4

will receive corrective action issued as an Unscheduled Absence Points (UAPs). Agents receive UAPs for a number of reasons: arriving late, departing early, unscheduled absences, no call no shows, and pattern behavior. Please see below for the associated number of UAPs for the new hire introductory period: • 1 UAP = Written Warning • 2 UAPs = Final Written Warning • 3 UAPs = Termination. Leaders will partner with Human Resources (HR) when needed. Corrective action for attendance may be expedited if patterns of unacceptable attendance occur.

During the relevant time period, the Respondent employed 425 employees in the Complainant's Department. The Respondent reports that they do not track the disability status of their employees. Also, the Respondent does not maintain data on the number of disability accommodation requests made or granted. During the relevant period, 37 employees were terminated by the Respondent and 16 of those employees were terminated for attendance issues.

There were two complaints made against the same person that the Complainant alleges harassed her, Dawna Williams ("Williams") (disability status unknown). In or about February 2018, one employee complained that Williams referred to herself as "Big D" and commented that the nickname was funny because it referred to genitalia. Comcast interviewed Williams and other employees, and concluded that Williams referred to herself as "Big D," but did not correlate the name to genitalia. This employee also complained that Williams was perceived as "pushy and confrontational." Two other employees shared this sentiment, and Williams was coached on improving her communication style to avoid this perception. In or about July 2018, another employee complained that when she informed Williams that she was having difficulty following trainings due to her ADHD, Williams responded by changing the subject and criticizing other employees for using their cell phones during trainings. This employee also complained that Williams made fun of certain class members when they did not understand the trainings. The Respondent coached Williams that her training style was perceived by some employees to be too informal and that she should refrain from speaking negatively about employees with their peers.

<u>Legal Framework</u>

In general, a burden-shifting framework of proof applies in discrimination cases, which requires both the Complainant and the Respondent to prove specific elements of each claim. If the Complainant meets the burden of proving the initial elements of a claim ("prima facie case"), then the burden shifts to the Respondent to justify the action challenged by the Complainant. If the Respondent is able to provide a legitimate, non-discriminatory reason for the action taken, the burden shifts back to the Complainant to prove that the reason asserted by the Respondent is merely a pretext or cover-up for discrimination. <u>Colorado Civil Rights Commission v. Big O Tires, Inc.</u>, 940 P.2d 397 (Colo. 1997); <u>Ahmad Bodaghi and State Board of Personnel, State of Colorado v. Department of Natural Resources</u>, 995 P.2d 288 (Colo. 2000).

5

<u>Analysis</u>

<u>Disability discrimination: § 24-34-402(1)(a) (accommodation is not at issue)</u>

1. The Complainant is a person with a disability, meaning they:

    a.     Have a physical or mental impairment that substantially limits one or more major life activities, has a record of a disability or is regarded as having a disability.

        i. physical or mental impairment is broadly interpreted and includes a physiological disorder or condition, cosmetic disfigurement or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory, speech organs, cardiovascular, reproductive, digestive, genito-urinary, hemic, lymphatic, skin, endocrine, or any mental or psychological disorder, such as an intellectual disability, traumatic brain injury, emotional or mental illness, and specific learning disabilities.

        ii. substantial limitation means that the physical or mental impairment limits a major life activity to a significant degree. Factors to consider include: nature and severity of impairment, duration of impairment, and actual or expected permanent or long-term impact of impairment; an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active; determination shall be made without regard to the ameliorative effects of mitigating measures.

        iii. major life activity includes functions that are of central importance to daily life, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, reading, concentrating and working; also includes the operation of major bodily functions such as functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine and reproductive functions.

        iv. has a record of a disability, means there is a history of a substantially limiting impairment, regardless of whether they are limited in performance of one or more major life activities.

        v. are regarded as having an impairment, means the person is treated as having a physical or mental impairment that substantially limits one or more major life activities, regardless of whether the person has such an impairment.

2. The Respondent knew or should have known that the Complainant is a person with a disability.

3. The Complainant could perform the essential functions of the job, with or without an accommodation;

4. The Complainant suffered an adverse employment action (discharge, demotion, suspension, failure to hire, failure to promote, etc.); and

5. The circumstances give rise to an inference of unlawful discrimination.

The Complainant provided sufficient documentation to the Division to support that she has a disability (arm impairment) which substantially limits one or more major life activities. On or about December 12, 2019, Sedgewick, the third-party contractor that assists the Respondent with requests for accommodation, approved the Complainant's request for accommodation. The Complainant was approved for "intermittent medical leave of absence of 4 occurrences per month with each occurrence lasting up to 1 day: 12/03/2019-5/31/2019." The Respondent was made aware that the Complainant's request was approved.

The Complainant is regarded as having this disability and this disability substantially limits her in the performance of a major life activity. The Complainant did not provide documentation as to her mental health conditions. After interviewing the Complainant, she explained that her arm impairment was the only disability at issue in this case. Based on the foregoing, the Complainant is a member of the protected class, disability as to her arm impairment.

<u>Harassment § 24-34-402(1)(a) Hostile Work Environment by a coworker/non-employee or by a supervisor that does not culminate in a tangible employment action:</u>

1.  The Complainant belongs to a protected class;
2.  The Complainant was subjected to adverse treatment based on the protected class;
    a.  the treatment was unwanted or unwelcome;
    b.  the treatment was subjectively and objectively unreasonable; and
    c.  the treatment was severe or pervasive.
3.  The treatment had the purpose or effect of creating a hostile, intimidating, or offensive work environment.
4.  The Respondent is liable unless it establishes an affirmative defense that:
    a.  The Respondent exercised reasonable care to prevent and promptly correct the harassment; or
    b.  The Complainant failed to take advantage of any preventative or corrective opportunities provided by the Respondent.

The Complainant belongs to a protected class based on her disability. The Complainant alleges that she was subjected to harassment by Williams. The Complainant reports that Williams discussed her medical issues with coworkers, complained that she was taking too many days off even though her time off was approved by the Respondent,

7

and made rude comments about the way that the Complainant has to put her jacket on as a result of her physical impairment.  The Complainant also filed a complaint about Williams with the Respondent, where she also stated that Williams had touched her knee to feel the fabric on her pants. The Respondent assigned an Employee Relations Advisor who investigated the complaint. The investigator found that:

> Ms. Williams did not make any public comments about [the Complainant's] medical condition. However, she did ask [the Complainant] if she would be present for key training sessions given her many absences. While Ms. Williams was aware that [the Complainant] was working with Sedgwick on accommodation requests, she was not aware of [the Complainant's] underlying medical condition(s). Ms. Williams touched [the Complainant's] knee because she thought the fabric was unique and "cool." Ms. Williams asked [the Complainant] about the manner in which she stepped into her zipped jacket, but the comment was not made maliciously. To the contrary, [the Investigator] confirmed that Ms. Williams made the comment out of concern because it appeared that [the Complainant] was going to step over her jacket.

The investigator also found instances where Williams had been 'too casual' in her communication with other employees. As a result, it was recommended that Williams receive a coaching regarding communication and establishing professional boundaries, which she did.

The Division interviewed the Complainant's Direct Supervisor, Zach Kelsay ("Kelsay") (disability status unknown). He observed the Complainant and Williams interact as he sat in on the training class most of the time. He reports it was a small environment and there were only four employees in the class. Kelsay observed Williams asking the Complainant about her absence one time and the Complainant was the only other trainee in the room at that time. Kelsay also observed the incident with the Complainant stepping into her coat. He described Williams as expressing concern for the Complainant by saying "are you ok?" and "is your jacket broken?" The Complainant responded, "if my arm worked I wouldn't have this issue." After this comment, Kelsay observed Williams to be embarrassed and apologize.

The Complainant did not believe that the Respondent thoroughly investigated her complaint as they did not make her an active part of the investigation. She insists that Williams made several comments about her medical condition in front of the training group. Specifically, the Complainant said in her interview with the Division that Williams made "a big show of it (her medical condition) during a breaks and would not wait till others were out of the room and it made her feel like a freak." The Complainant also said that Williams "asked her about her arm. Williams would gesture at her own arm thinking she was being discreet but she was not discreet at all." With regard to the coat incident, the Complainant also explained that, "after being informed of why she was dressing herself this way, Ms. Williams proceeded to state 'Well, I've never had to put my jacket on that way.'" The Complainant informed the Division in her rebuttal that Williams knew about her underlying condition

8

because the Complainant "explained to Ms. Williams on several occasions that she suffered a birth injury which led her to become the way she is now in hopes that Ms. Williams will understand that she is not lazy and might do things differently than the rest of the class." The Complainant also felt that, "at no point is it acceptable for a trainer to touch one of his/her trainees, no matter how 'cool' the pattern or fabric of their pants are." Finally, the Complainant stated, "It is inconceivable to think that a trainer with a history of being 'too casual' and/or harassing her trainees is still allowed to be in charge of establishing the professional tone of the company."

To establish a harassment claim, the Complaint must show that the conduct was unwanted or unwelcome, objectively and subjectively unreasonable, severe or pervasive, and that it had the effect of creating a hostile, intimidating or offensive work environment. The Complainant did not provide sufficient evidence to meet her burden. Additionally, while the Complainant may have felt this treatment was unwanted and unwelcome and that it created a hostile work environment for her, the Respondent took measures to address the Complainant's concerns. Thus, the Complainant has not shown that the alleged adverse treatment was based on her protected class.

<u>Failure to Accommodate a Disability: § 24-34-402(1)(a)</u>

1.  The Complainant is a person with a disability or a record of a disability;
2.  The Complainant is otherwise qualified for the position;
3.  The Complainant requested a plausibly reasonable accommodation; and
4.  The Respondent refused to provide the accommodation.

If the Complainant establishes a prima facie case, the burden of production shifts to the Respondent to either:

1.  Rebut one or more elements of the Complainant's prima facie case; or
2.  Establish that the requested accommodation poses an undue hardship or a direct threat.

If the Respondent meets this burden, the Complainant must produce evidence of his or her individual capabilities and suggestions for possible accommodations to rebut the Respondent's evidence, as the Complainant ultimately has the burden of proof of discrimination.

The Complainant is a person with a disability and is otherwise qualified for her position as a Customer Account Executive. The Complainant explained in her interview with the Division that during her first week working for the Respondent, new employees were encouraged to look through the "portal" and learn about the benefits the Respondent provides. She found a link about ergonomics and that the Respondent would send someone to assess what tools she would need to work

9

more comfortably. The Complainant stated that Human Resources (HR) Representative, Jennifer Reed ("Reed") (disability status unknown), reached out to her to let the Complainant know that she could request an accommodation which would allow her to take four days off per month, even during training, provided that she worked with her doctor and completed the forms required by Sedgewick who handled these requests. The Complainant did so. She reports that in her first attempt, her doctor did not submit the correct forms so she had to open another case and submit the correct forms. On or about December 12, 2019, she received a letter indicating that her accommodation request had been approved. As her request was approved by Sedgewick, her request was a plausibly reasonable accommodation. The Complainant had been taking off "ADA days" while she waited for her request to be approved. Once the approval came in, the Respondent credited these absences and waived any pending disciplinary action. Thus, the Respondent did not refuse to provide the accommodation requested by the Complainant. The Complainant believes she was denied accommodation as she was ultimately fired due to her attendance. This argument will be discussed further under the next section.

Discharge: § 24-34-402(1)(a)

1. The Complainant belongs to a protected class;
2. The Complainant was satisfactorily performing the job at issue;
3. The Complainant was discharged; and,
4. The circumstances give rise to an inference of unlawful discrimination.

The Complainant belongs to a protected class based on her disability. The Complainant was still in her training period, but the evidence indicates the Complainant's performance met the Respondent's expectations, with the exception that she had been placed on a corrective action plan due to her attendance. On or about December 17, 2019, the Complainant was discharged as a result of multiple attendance violations. The Respondent reports the Complainant was absent:

- 10/21/2019 – Absent for entire shift
- 10/28/2019 – Absent for entire shift
- 10/31/2019 – Absent for entire shift
- 11/4/2019 – Absent for entire shift
- 11/5/2019 – Absent for entire shift
- 11/6/2019 – Absent for entire shift
- 11/11/2019 – Absent for entire shift
- 11/14/2019 – Arrived late
- 11/19/2019 – Arrived late and left early
- 11/25/2019 – Absent for entire shift
- 12/2/2019 – Absent for entire shift
- 12/3/2019 – Absent for entire shift

- 12/5/2019 – Absent for entire shift
- 12/9/2019 – Absent for entire shift
- 12/10/2019 – Absent for entire shift
- 12/16/2019 – Absent for entire shift.

This amounted to seven absences in November and six absences in December.

On December 11, 2019, the Complainant was given a second Final Written Warning and invited to a discipline meeting with her Supervisors. She was told that if she had any further absences she could be terminated. Specifically, she was told by Senior Operations Manager, Rob Albers ("Albers") (disability status unknown), that she was on 'thin ice.' In her rebuttal and during her interview with the Division, the Complainant reported being confused at this meeting as her accommodation request was still pending with Sedgwick and she believed once it was approved, her absences would be covered. On December 16, 2019, the Complainant missed work again as she was sick and had to go to the Emergency Room.  Despite having a note from her doctor, she was terminated on or about December 17, 2019.

The Complainant asserts that based on Reed's representations, she believed she was able to take four ADA days per month while her accommodation request was pending and despite being in her introductory training period. In her Rebuttal the Complainant states, "Suzarah Dorleus was ready and willing to work the full 40 hours per week schedule at Comcast as a CAE 2, even though it meant she would be in pain at the end of the workday. Suzarah would not have been absent as many times as she was if she was not told directly by Jennifer Reed that she was able to start taking these ADA days during training." In response to the Complainant's rebuttal the Respondent stated,

> Jennifer Reed is an Employee Operations Supervisor responsible for helping on-board new hires (among other job duties).  Shortly after being hired, [the Complainant] informed Ms. Reed that she would need to take time off for 'short term disability.'  Ms. Reed informed [the Complainant] that she was not eligible for FMLA leave, but provided [the Complainant] with guidance on opening a claim with Sedgwick to explore possible accommodations (including continuous or intermittent leave).  Ms. Reed never informed [the Complainant] that she could take days off during her training period.  To the contrary, Ms. Reed informed [the Complainant] that the training sessions were critically important, but that the Company would work with [the Complainant] to determine if medical accommodations were appropriate.

The Complainant also understood the general attendance policy for new hires allowed her to take three days off per month.

The attendance policy for new hires actually discourages employees from taking off any days at all during training. New hires are supposed to be present every day and do not receive any paid time off until after the 90-training period. New hires are only allowed

three absences during the entire 90-day period before termination is considered. The Division interviewed Kelsay about this issue. Both the Complainant and Kelsay stated they had a good working relationship. He explained that the attendance policy is strict and he does not have a lot of discretion when applying it. The Complainant should have been aware of the new hire attendance policy as she was given the written document, it was discussed at the two-day orientation she attended, and he had individual check-ins with her. He stated "there was no reason why [the Complainant] should think that you get three Unscheduled Absence Points (UAPs) a month." Kelsay also stated that the Complainant's "absences were a concern. Training is important to make sure she could help customers. You have to play catch up if you miss training. It's hard to learn on the fly when you hit production."

The Respondent also stated in a response to the rebuttal that the Complainant's, "leaders (and Ms. Reed) always stressed the importance of attendance, particularly during the introductory training period. [The Complainant] was repeatedly informed about the attendance policy, the accommodation process through Sedgwick, and potential discipline related to unexcused absences."

Kelsay was present for the discipline meeting that occurred on December 11, 2019. He stated it was a formal discussion and the Complainant was advised that she had received a Final Written Warning for the UAPs that were not covered by her accommodation. She was told she could not miss another day in December. During his interview Kelsay stated that it was an emotional meeting but it appeared the Complainant understood, though she did not ask any questions pertaining to the situation. After the Complainant's absence on or about December 16, 2019, Albers, Kelsay, Reed, and another HR representative jointly made the decision to terminate the Complainant as she had exceeded the allotted UAPs even after her accommodation days were accounted for.

The record reflects that even when the Complainant's "ADA Day" absences were waived, she had over four UAPs which was a violation of the attendance policy, with a possible consequence being termination. The Complainant was also warned of the consequences of missing another day of work. While the record shows that the Complainant did not fully understand the attendance policy which unintentionally led to her multiple violations, the circumstances do not give rise to an unlawful inference of discrimination due to disability. Additionally, the Respondent did not fail to accommodate the Complainant by discharging her for absences she accumulated beyond her disability accommodation.

Retaliation: § 24-34-402(e)(IV)
1. The Complainant (or an individual within the Complainant's zone of interest) engaged in protected activity by either opposing unlawful discrimination or participating in an investigation of discrimination;

2. The Complainant was subjected to adverse treatment that would dissuade a reasonable person from engaging in protected activity; and
3. There is a causal connection between the protected activity and the adverse treatment.

The Complainant engaged in a protect activity on or about the week of October 7, 2019, when she requested an accommodation for her arm impairment and, on or about November 20, 2019, when she filed a complaint against her trainer, Williams. The Complainant was given a Final Written Warning and discharged as a result of her attendance violations. The Complainant argues she was disciplined and discharged for her engagement in protected activities. She also remarked that Williams stated she was "very close friends with Albers," one of her supervisors, and they appeared to be "buddy, buddy." Although the Complainant was subject to the adverse treatment of discipline and discharge, the record does not indicate that the Respondent had a retaliatory motive. Therefore, there is not a causal connection between the protected activity and the adverse treatment.

Based on the evidence contained above, I determine that the Respondent has not violated C.R.S. 24-34-402, as re-enacted.

<u>Appeal and Dismissal Information</u>

In accordance with C.R.S. 24-34-306(2)(b)(I)(A) and Rule 10.6(A)(1) of the Commission's Rules of Practice and Procedure, the Complainant may appeal the dismissal of this claim to the Commission within ten (10) days, as set forth in the enclosed form.

If the Complainant wishes to file a civil action in a district court in this state, which action is based on the alleged discriminatory or unfair practice that was the subject of the charge filed with the Division, such must be done:

a.   Within ninety (90) days of the mailing of this notice if no appeal is filed with the Colorado Civil Rights Commission or

b.   Within ninety (90) days of the mailing of the final notice of the Commission dismissing the appeal.

If the Complainant does not file an action within the time limits specified above, such action will be barred and no State District Court shall have jurisdiction to hear such action. C.R.S. § 24-34-306(2)(b)(I)(C).

On Behalf of the Colorado Civil Rights Division

*Sarah R Lyons*

Aubrey Elenis, Director
Or Authorized Designee

October 7, 2020

Date

13

# HOW TO FILE AN APPEAL OF THE DIRECTOR'S DETERMINATION

## Commission's Authority

You have been issued a Determination dismissing your case regarding your charge of discrimination. If you disagree with the Director's decision in the dismissal of your charge, you have the right to appeal that determination [C.R.S. 24-34-306(I)(A)] to the Colorado Civil Rights Commission (Commission). The Commission is a separate and distinct body from the Colorado Civil Rights Division (CCRD). The Commission is composed of seven members appointed by the Governor and one of its many functions is to review properly filed appeals.

The Commission has the option to either:

1) *Uphold* the Director's determination, thus dismissing your case;

2) *Remand* the case to the Division for further investigation on a specific issue; or

3) *Reverse* the Director's determination.

## Filing Requirements

**The appeal process is not intended to simply review the evidence already submitted, which formed the basis of the Director's determination.**  The Commission will only consider a properly filed appeal wherein:

➢  *Available, substantial, and relevant evidence exists now that was previously not available, presented, and considered during the investigation; or*

➢  *There is clear evidence that existing evidence was misinterpreted or the determination was based on erroneous information.*

**In both, it is your responsibility to submit the above information along with your Notice of Appeal.**

## Filing Procedure

**The Notice of Appeal form and relevant documentation MUST be received in the Civil Rights Division's office WITHIN 10 DAYS from the date of the mailing of the Director's Determination. If your appeal is not received within the 10-day time limit, you will lose your right to appeal.**  Filling out any other form included in this mailing does not change the 10-day deadline for appeal. If you wish to appeal, but cannot file a written appeal within the 10-day time limit, contact the Appeal Coordinator *before* the 10-day period is over to request an extension of the filing deadline.  A verbal request for an extension must be confirmed in writing and an extension is not official until approved by the Commission or the Commission's designee.

If you are asserting that *relevant evidence exists now that was previously not available, presented, and considered during the investigation*, you will need to attach a copy of that evidence with your Notice of Appeal. If you assert that there is witness testimony to support your appeal, please submit a statement from your witness(es).   It is not sufficient for you to simply provide the name of the witness(es). The witness statement(s) should include testimony that is specifically relevant to your case and argument.  It must also include the current telephone number(s) and address(es) of the witness(es). Witness statements need not be notarized.

If you are asserting that *existing evidence was misinterpreted or the determination was based on erroneous information*, you will need to identify the particular evidence and specific facts that were misinterpreted.  You must also specify how this misinterpretation effected the overall case decision. It is not sufficient to simply state that you disagree with the Director's decision.

Upon receipt of your Notice of Appeal, if it is determined that the appeal is either:

**1)   untimely;**
**2)   you have failed to provide new evidence that was previously unavailable; or**
**3)   you have failed to identify specific information regarding a misinterpretation of evidence or erroneous basis for the determination;**

you will be notified in writing that your appeal has been denied.  You will also be provided with a Notice of Dismissal and, in Employment cases, you will be provided with a notification regarding the allowable time frames in which you may file an action in civil court.

If you have submitted the necessary information required for consideration, your case will be reviewed on appeal by the Commission at a regularly scheduled Commission meeting.  You will be notified of the date of the Commission meeting for your appeal review.

General Information

If it is necessary for you to examine the information in your file in conjunction with preparing your appeal, please make arrangements to review your case file prior to your submission of the Notice of Appeal. Since your Notice of Appeal must be filed within ten (10) days, it is advisable that you make this appointment as soon as possible. Please contact the Commission Coordinator at (303) 894-2997, or 1-800-262-4845 (outside Denver area only), if you wish to review the file.

It is not necessary for you to file an appeal in order to exhaust the administrative process. In Employment cases, the enclosed Letter of Determination includes the notice of Right to Sue, which allows you to file your case in the civil court having appropriate jurisdiction.

If you are filing an appeal, please return the Notice of Appeal and documentation to:

**COLORADO CIVIL RIGHTS DIVISION**
Attn: Appeal Coordinator
1560 Broadway, Suite 825
Denver, CO  80202-5143
By fax: (303) 894-7830
By e-mail:  dora_ccrd@state.co.us

# NOTICE OF APPEAL to the COLORADO CIVIL RIGHTS COMMISSION

**Instructions:**

If you are filing an Appeal, this form must be submitted <u>within</u> **<u>ten (10) days</u>** <u>of the date of the mailing of the Director's determination</u> of no probable cause. If you wish to obtain an extension to file, you must contact the Appeal Coordinator ***before*** the 10-day period is over and a verbal request for an extension must be confirmed in writing. An extension of time to file the appeal is not official until approved by the Commission or the Commission's designee.

Please type or use black ink. Attach additional pages and/or documents as necessary.

**Charge No.:** _____

**Charging Party:** _____

Address: _____ Apt. #:_____

City: _____ State: _____ Zip Code: _____

Telephone No(s): _____

**Respondent:** _____

**A.** <u>**New Information Available**</u>: What evidence is now available that was not available and presented during the investigation?  What is the relevance and significance of this information to your case? Please attach copies of the new information, including any witness statements.

**B.** <u>**Facts in Dispute**</u>: What material facts presented in the Director's determination are incorrect or were misinterpreted?  Please attach your argument and documentation to support your claim or make specific reference to evidence previously submitted in the investigation.

<u>PLEASE NOTE:</u>  <u>Failure to state a specific reason or reasons for appeal will result in automatic denial of a review of your appeal by the Commission.</u>

After it is determined your appeal filing is accepted and warrants consideration, the appeal will be scheduled for review at a regularly scheduled Commission meeting. You will be notified of the date of your scheduled appeal review.

_____          _____
**Signature**                                                                    **Date**

Please return this form to:
Colorado Civil Rights Division
Attn.: Appeal Coordinator
1560 Broadway, Suite 825
Denver, CO 80202-5143 or
Fax: 303-894-7830
or E-mail: dora_ccrd@state.co.us



**COLORADO**
**Department of**
**Regulatory Agencies**
Colorado Civil Rights Division

Because your complaint was concurrently filed with the Equal Employment Opportunity Commission ("EEOC") under Title VII of the Federal Civil Rights Act of 1964 and/or the Americans with Disabilities Act, you also have the right to request that the EEOC conduct a Substantial Weight Review of the Determination.

If you have any questions regarding a Substantial Weight Review, please contact:

State and Local Unit
3300 N. Central Ave, Suite 690
Phoenix, AZ 85012
Or by email:
**phoenix.intake@eeoc.gov**

To obtain a Substantial Weight Review, you must send your request in writing, within 15 days of the date of your receipt of this Determination to the above address.

Your request for a substantial weight review by the EEOC will not extend the 10-day period to file an appeal to the Colorado Civil Rights Commission. If you intend to appeal, you must do so within 10 days from the date of the Letter of Determination, even if you request a review by the EEOC.



# CERTIFICATE OF E-MAILING

This is to certify that on **October 21, 2020** a true and exact copy of the Closing Action of the below-referenced charge was e-mailed addressed to the parties and/or representatives listed below.

CCRD Case Number:
**E2000007763**

suzziide@gmail.com

Chase_Ensign@comcast.com



COLORADO
**Department of
Regulatory Agencies**
Colorado Civil Rights Division

David L. Martinez
**Division of Civil Rights**
1560 Broadway, Suite 825
Denver, CO 80202
www.dora.state.co.us
david.l.martinez@state.co.us

# NOTICE OF APPEAL to the COLORADO CIVIL RIGHTS COMMISSION

**Instructions:**

If you are filing an Appeal, this form must be submitted <u>within **ten (10) days** of the date of the mailing of the Director's determination</u> of no probable cause. If you wish to obtain an extension to file, you must contact the Appeal Coordinator **before** the 10-day period is over and a verbal request for an extension must be confirmed in writing. An extension of time to file the appeal is not official until approved by the Commission or the Commission's designee.

Please type or use black ink. Attach additional pages and/or documents as necessary.

**Charge No.:** E2000007763

**Charging Party:** Suzarah Dorleus

Address: 9888 E Vassar Dr                                    Apt. # H105

City:    Denver                        State: CO        Zip Code: 80231

Telephone No(s): 

**Respondent:** (407) 755-7649

**A.** <u>**New Information Available**</u>: What evidence is now available that was not available and presented during the investigation? What is the relevance and significance of this information to your case? Please attach copies of the new information, including any witness statements.

**B.** <u>**Facts in Dispute**</u>: What material facts presented in the Director's determination are incorrect or were misinterpreted? Please attach your argument and documentation to support your claim or make specific reference to evidence previously submitted in the investigation.

<u>PLEASE NOTE:</u>  <u>Failure to state a specific reason or reasons for appeal will result in automatic denial of a review of your appeal by the Commission.</u>

After it is determined your appeal filing is accepted and warrants consideration, the appeal will be scheduled for review at a regularly scheduled Commission meeting. You will be notified of the date of your scheduled appeal review.

_____              October 29th, 2020
**Signature**                                   _____
                                         **Date**

Please return this form to:
Colorado Civil Rights Division
Attn.: Appeal Coordinator
1560 Broadway, Suite 825
Denver, CO 80202-5143 or
Fax: 303-894-7830
or E-mail: dora_ccrd@state.co.us

Evidence of Dishonesty

The evidence that is available currently that was not available previously is the f act that Comcast employees are being dishonest about the things that were said.

For example, Comcast claims that Jennifer Reed never informed me that I could take ADA days during training when this is a complete lie. If this "fact" was stated under oath, it would've been considered perjury. Ms. Reed informed me that I, in fact, could take these days during training & that she would work with me on disciplinary action as long as the case with Sedgwick was actively pending—which it was.

Mr. Kelsay claims that I did not ask questions during the disciplinary meeting and this, again, is a false statement. I attempted to inform Rob Albers during this meeting that my case with Sedgwick was still pending and that I was working with my doctor to make sure that the paperwork was properly submitted this time around. Mr. Albers shut me down immediately and told me that it didn't matter and that I was still on thin ice. Given the hostile work environment that I'd endured, I didn't feel comfortable saying anything else. I think it's important to note that Zachary Kelsay was often absent from training due to military obligations.

The humiliation and constant unwanted attention that I was receiving due to my medical condition is not only unjust, but unconstitutional. Comcast has been dishonest with every allegation claiming that the harasser was "unaware of my condition", or "never publicly made comments", then claiming that Ms. Reed "never informed me that I could take ADA days during training", and that I "didn't ask questions during my disciplinary hearing". Dawna Williams never once asked me if I was okay or if my jacket was broken during this incident. She stated, "What are you doing?! … I've never had to put my jacket on like that." It wasn't concern. Zachary Kelsay is supporting a false narrative.

Comcast is making a mockery out of this investigation. Comcast is taking every opportunity they receive to be dishonest about what its employees said to me, actions those employees took, and the amount of intimidation that I endured due to my medical condition. I will not go down quietly. It is not right for them to treat employees this way. Let's not brush over the fact that the only reason I missed the extra day in December was because I was hospitalized due to a viral infection. I was not able to hold food down for the whole weekend. If I'd gone to work, I would've fallen ill and been sent home or to the doctor. I even had a note from my doctor to excuse my absence, which was ignored.

Please, I ask that you take another look at the facts of the case. I've detailed the harassment incidents that contributed to a hostile/intimidating workplace. I have laid out, in excruciating detail, the words that were said to me and the names of the people who said it to me. This case should not be dismissed solely because Comcast denies the allegation that their employees were aware of what was going on. Where is the proof that Comcast is providing this office with pure honesty? I deserve justice for what I was put through. Had

the HR department not been so sloppy, and the trainers so touchy, I would still be employed and not relying on unemployment to support myself—especially during a pandemic.

I humbly ask for a reconsideration of the facts of the case and for a more thorough investigation of them.



**COLORADO**
Department of
Regulatory Agencies
Colorado Civil Rights Division

Sent via email.

December 22, 2020

Suzarah Dorleus
9888 E Vassar Dr
Denver, CO 80231
suzziide@gmail.com

RE:   Complaint No E2000007763
      Suzarah Dorleus v. Comcast Cable Communications, LLC

Dear Suzarah Dorleus:

This letter is to inform you that the Colorado Civil Rights Commission has reviewed your appeal. The Commission has determined that there is insufficient basis to warrant further action and has affirmed the director's decision of no probable cause.

If your case was an employment discrimination matter, dual filed with the Equal Employment Opportunity Commission (EEOC), you have the right to request a substantial weight review of your file by the EEOC. You must send your request in writing, within 15 days of the date of this notice. Please refer to the form that was included in an earlier mailing to you that provides complete instruction on how to obtain this review by the EEOC.

If you wish to file a civil action in a district court in this state, which action is based on the alleged discriminatory or unfair practice that was the subject of the charge filed with the Commission, you need to file within 90 days of the date of this mailing pursuant to CRS 24-34-306(2)(b)(I)(B & C).

Pursuant to CRS 24-34-306 (2) (b) (I) if you as the Charging Party do not file such an action within the time limits specified above, such action will be barred and no State District Court shall have jurisdiction to hear such action.

On behalf of the Commission,

Aubrey L. Elenis, Esq.
Director

cc:  Chase Ensign, chase_ensign@comcast.com





**Chase Ensign**
Senior Counsel
Chase_ensign@comcast.com

Tel: 925-424-0159

May 12, 2020

<u>**VIA EMAIL**</u>
Natalie Martinez
Colorado Civil Rights Division
1560 Broadway Street, Suite 825
Denver, CO 80202
natalie.martinez@state.co.us

*Re:*   ***Suzarah Dorleus***
         ***CCRD Charge No. E2000007763***
         ***EEOC Charge 32A-2020-00267***

Ms. Martinez:

This position statement is submitted on behalf of Comcast Cable Communications Management, LLC ("Comcast" or "the Company") in response to the above-referenced charge of discrimination filed by Suzarah Dorleus (the "Charge"). Ms. Dorleus' allegations are completely baseless. She worked for Comcast for about two-and-a-half months. During this brief but critical training period, Ms. Dorleus was routinely absent from work. Comcast went to great lengths to accommodate Ms. Dorleus' requests for accommodation, including excusing *all* of the absences requested by her physician, and approving Ms. Dorleus' request for intermittent leave (4 absences per month).

Despite these efforts, Ms. Dorleus' continued to exhibit severe and persistent attendance violations above and beyond her accommodations. Her employment was eventually terminated consistent with the Company's attendance policy. There is no evidence that Ms. Dorleus' leaders discriminated against her based on her medical condition, and all of the evidence is to the contrary. Because this Charge is entirely without merit, the Company respectfully requests that the Colorado Civil Rights Division ("CCRD") dismiss it with a "no cause" finding.[1]

---

[1]   The Company provides this information, which is confidential, with the understanding that it will be kept confidential and used or disclosed by the CCRD and/or EEOC only for the purpose of resolving the above-referenced Charge and for no other purpose, including use or disclosure in connection with further proceedings between the Company and Ms. Dorleus, unless otherwise compelled by law and after notice and an opportunity to object are given to Comcast. This response is directed solely at the allegations contained in the above-referenced Charge and is based on facts presently known to Comcast. The Company

COM:1131327v1

# STATEMENT OF FACTS

## I.    Comcast's Business & Commitment to Equal Opportunity

Comcast is one of the nation's largest video, high-speed internet, and phone providers to residential and business customers.  As a Company that values its diverse workforce, Comcast is absolutely committed to its policies of non-discrimination and non-harassment in the workplace. Comcast provides equal employment opportunity to all qualified individuals without regard to any protected trait in all aspects of the employment relationship, including application and initial employment, corrective action, working conditions, compensation, termination and application of service, retirement, and employee benefit plan policies.  In order to ensure a productive, safe, and efficient work environment for all of its employees, the Company has adopted several policies including the Equal Employment Opportunity Policy, Harassment Policy, and the Open Door Policy.  These policies can be found in the Company's Handbook which is accessible through the Company's internal website, Team Comcast.  (*See* Copies of Referenced Comcast Policies, attached as Exhibit A.)

Comcast also is committed to providing reasonable accommodations to employees with disabilities.  Its Reasonable Accommodation Policy provides:

> Comcast is ready and willing to discuss requests for reasonable accommodations that will enable an employee perform his/her essential job functions.  There are many forms of assistance that may be available to employees who may have such a need due to a disability. Comcast's practice is to engage in an interactive dialogue with an employee requiring assistance (and/or the employee's health care provider, as permitted by applicable law) in order to determine if and what kind of accommodation is needed.

> If you need an accommodation, please contact either your Human Resources representative or Sedgwick (Comcast's third party accommodations request administrator) at 855-473-7830 to initiate the interactive dialogue.

(*See* Exhibit B.)  Comcast employees do not have to use their leave entitlement in one block.  Leave can be taken intermittently or on a reduced leave schedule when medically necessary. Comcast's leave of absence and accommodation process is administered by Sedgwick Claims Management ("Sedgwick"), which (among other things) reviews employees' leave usage to ensure that it is consistent with medical certifications and medical leave guidelines.  Comcast strictly prohibits any interference with or denial of employees' exercise of rights under the FMLA or ADA.

The Company also provides Comcast Listens, an avenue through which employees can raise workplace concerns.  Employees can file complaints 24/7 via telephone or web portal, and can choose to identify themselves or remain anonymous.  Complaints are assigned to trained investigator, generally from Comcast's Employee Relations department, for investigation. Reporters are able to access the Comcast Listens web portal after filing their complaints and can communicate with investigators through the web portal.

Comcast strictly prohibits all forms of retaliation against an employee who makes a

---

respectfully reserves the right to supplement or amend this response in the future, including the right to add additional information or defenses.

complaint or raises a concern in good faith.  The Anti-Retaliation Policy also prohibits retaliation against an employee who provides information or otherwise assists in an investigation.  (*See* Exhibit C.)

## II.   Factual History

### A.   Ms. Dorleus' Employment

Comcast hired Ms. Dorleus on October 7, 2019 as a Customer Account Executive ("CAE") at its customer service call center in Centennial, Colorado.  During her brief employment, Ms. Dorleus' supervisor was Zachary Kelsay and her human resources leader was Meghan Williams.  Ms. Dorleus was a full-time employee and scheduled to work 40 hours per week.

Comcast call centers are staffed to maintain the appropriate level of service and employee workload.  Consistent and predictable attendance is critical for Comcast's efficient business operations.  Employees play an essential role in day-to-day operations because the Company depends on them to deliver exceptional customer service.  An essential function of the CAE position is regular, consistent and punctual attendance.  (*See* Exhibit D.)  Reliable attendance is *especially* crucial during new hire introductory period (first 90 days of employment).  Respondent's attendance policy provides that "during this time, [employees] will participate in a comprehensive training program to learn about the tools and resources needed to do [their] job."  (Exhibit E, National Call Center Attendance Policy ("Attendance Policy")).  The Attendance Policy further provides that during the introductory period, employees "will meet regularly with [their] leader to discuss attendance, conduct, and performance," and that the "expectation is that [the employee] will be at work on time each day of your introductory period."

Because the training during the introductory period is so important, more heightened standards of attendance apply to new hires.  Specifically, one Unexcused Absence Point ("UAP") results in a written warning, two UAPs results in a final written warning, and three UAPs results in termination.  UAPs occur where employees have unexcused absences, arrive late, or leave early.  Ms. Dorleus received and acknowledged the Attendance Policy shortly after she was hired.  (Exhibit F.)

### B.   Comcast Provided Ms. Dorleus with Many Accommodations Despite her Severe and Persistent Attendance Violations.

Contrary to Ms. Dorleus' allegations, Comcast went to great lengths to accommodate her requested accommodations, and there is absolutely no evidence that the Company discriminated against her based on her medical condition.  During her short tenure with the Company, Ms. Dorleus incurred numerous attendance violations (most of which were excused) as follows:

- 10/21/2019 – Absent for entire shift
- 10/28/2019 – Absent for entire shift
- 10/31/2019 – Absent for entire shift
- 11/4/2019 – Absent for entire shift
- 11/5/2019 – Absent for entire shift
- 11/6/2019 – Absent for entire shift
- 11/11/2019 – Absent for entire shift

- 11/14/2019 –Arrived late
- 11/19/2019 – Arrived late and left early
- 11/25/2019 – Absent for entire shift
- 12/2/2019 – Absent for entire shift
- 12/3/2019 – Absent for entire shift
- 12/5/2019 – Absent for entire shift
- 12/9/2019 – Absent for entire shift
- 12/10/2019 – Absent for entire shift
- 12/16/2019 – Absent for entire shift

Under the National Attendance Policy, Ms. Dorleus incurred 3 UAPs in her first month of employment, which normally would result in termination of employment. However, shortly after being hired in October 2019, Ms. Dorleus submitted requests for medical accommodations related to these absences through Sedgwick. Comcast elected to delay any disciplinary decision until this claim was resolved. Eventually, Ms. Dorleus submitted medical forms requesting that Respondent waive her absences on 10/21, 10/28, 10/31, 11/4, and 11/05. Comcast approved this request and waived the UAPs for these absences.

Despite this accommodation, Ms. Dorleus did not show up to work on November 6 or 11, 2019. There was no accommodation request pending at this time. On November 13, 2019, Ms. Dorleus received a Final Written Warning ("FWW") for incurring 2 UAPs (consistent with the Attendance Policy). On November 14, 2019, Ms. Dorleus submitted a request for leave under the Family Medical Leave Act to retroactively excuse her absences. This request was denied because Ms. Dorleus had not come close to meeting the basic eligibility requirements under the FMLA (she had only worked one month out of the twelve required and had only worked 135 hours out of the 1,250 required). Nevertheless, another claim was opened to determine whether additional accommodations were appropriate. On December 3, 2019, Ms. Dorleus' physician submitted a medical certification requesting that Respondent provide Ms. Dorleus with four intermittent absences per week. (Exhibit G.) Comcast approved this request. (Exhibit H.) In addition, the medical certification requested a waiver of Ms. Dorleus' absences on 11/6 and 11/11. Comcast also approved this request and accordingly withdrew Ms. Dorleus' FWW.

Despite Comcast approving numerous leave requests, Suzarah continued to incur substantial attendance violations above and beyond her intermittent leave accommodation. Specifically, she was late or absent from work on 11/14, 11/19, 11/25, 11/26, 12/2, 12/3, 12/5, 12/9, and 12/10. After waiving four of these absences based on her intermittent leave accommodation, Ms. Dorleus still had more than 3 UAPs under the Attendance Policy, warranting termination. However, Ms. Dorleus' leaders opted to give her another chance and gave her a second FWW on December 11, 2019. This warning made clear that any further absences would result in further disciplinary action up to and including termination. Despite this warning, Ms. Dorleus missed work again on December 16, 2019, and her employment was terminated consistent with the Attendance Policy.

The termination decision was made collectively by supervisor Zachary Kelsay, manager Rob Albers, and human resources manager Meghan Williams.

### C. Ms. Dorleus' Complaint about her Trainer.

On November 20, 2019, Ms. Dorleus raised a complaint through Comcast Listens about

alleged conduct by her temporary trainer, Dawna Williams. Specifically, Ms. Dorleus complained that Ms. Williams: (1) commented on Ms. Dorleus' medical absences in front of the rest of the class; (2) touched Ms. Dorleus' knee to feel the fabric of her pants; (3) asked Ms. Dorleus "what are you doing" when Ms. Dorleus was stepping into her zipped jacket due to limited mobility.

This complaint was assigned to Employee Relations Advisor Vanessa Vargas, who conducted an investigation (including interviewing multiple witnesses) and concluded that:

- Ms. Williams did not make any public comments about Ms. Dorleus' medical condition. However, she did ask Ms. Dorleus if she would be present for key training sessions given her many absences. While Ms. Williams was aware that Ms. Dorleus was working with Sedgwick on accommodation requests, she was not aware of Ms. Dorleus' underlying medical condition(s).
- Ms. Williams touched Ms. Dorleus' knee because she thought the fabric was unique and "cool."
- Ms. Williams asked Ms. Dorleus about the manner in which she stepped into her zipped jacket, but the comment was not made maliciously. To the contrary, Ms. Vargas confirmed that Ms. Williams made the comment out of concern because it appeared that Ms. Dorleus was going to step over her jacket.

During the investigation, Ms. Vargas became aware of other instances where Ms. Williams was too casual in her communication style with employees. As a result, Ms. Vargas recommended that Ms. Williams receive a coaching regarding communication and establishing professional boundaries, which was delivered. Neither Ms. Vargas nor Ms. Williams were involved at all in the decision to termination Ms. Dorleus' employment.

## RESPONDENT'S POSITION

Ms. Dorleus' claims are completely baseless. First, her disability-based harassment claim fails for several reasons. Her sole allegation is that her temporary trainer, Ms. Williams, commented on her attendance and made a "rude" comment about the way in which Ms. Dorelus put on her jacket.[2] However, there is no evidence that Ms. William's alleged comments were in any way motivated by Ms. Dorleus' alleged medical conditions (i.e., bipolar disorder, anxiety, arm impairment). Moreover, the alleged conduct by Ms. Dorleus (i.e., asking Ms. Dorleus about her attendance and – on one occasion – commenting on the manner in which Ms. Dorleus put on her jacket) do not come close to establishing severe or pervasive harassment under the law. Finally, as soon as Ms. Dorleus complained about the alleged conduct by Ms. Williams, Comcast conducted a prompt investigation and took appropriate action. Ms. Vargas interviewed multiple witnesses and ultimately provided Ms. Williams with coaching to improve her communication style and maintain professional boundaries with her employees.

Ms. Dorleus claim for failure to accommodate her disability is also baseless. As explained above, Respondent went to great lengths to accommodate Ms. Dorleus' accommodation requests. In just 2.5 months, Ms. Dorleus incurred attendance violations on 16 occasions. Despite these infractions, Comcast delayed issuing performance management, repeatedly approved Ms. Dorleus' requests for accommodations (including intermediate leave in accordance with her physician's

---

[2]     Oddly, in her Charge, Ms. Dorleus no longer alleges that Ms. Williams touched the fabric on her pants (as she did in her Comcast Listens complaint).

recommendation), and waived the vast majority of Ms. Dorleus' absences. These accommodations were eminently reasonable.

Ms. Dorleus' claims for disability discrimination and retaliation fail for additional reasons. First, as explained above, the Company's decision to terminate Ms. Dorleus' employment was based on a legitimate non-discriminatory reason: Ms. Dorleus' severe and persistent poor attendance. Comcast consistently applies its Attendance Policy. Attendance is especially critical during the introductory period because CAEs receive training essential to performing their job duties. If anything, the Company gave Ms. Dorleus preferential treatment by delaying discipline, retroactively waiving many attendance violations, and re-issuing a FWW rather than termination on December 11, 2019. The only individual Ms. Dorleus accuses of making inappropriate comments, Ms. Williams, was in no way involved in Ms. Dorleus' discipline or termination.[3]

Finally, Ms. Dorleus' frequent and continued absences (despite the Company's good faith efforts to accommodate her) demonstrate that she was not qualified for her position within the meaning of the ADA. *See* 42 U.S.C. § 12111 ("The term 'qualified individual' means an individual who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.") An essential function of the CAE position is regular, consistent, and punctual attendance. These requirements are of heightened importance during the introductory period. Thus, Ms. Dorleus was not a qualified individual with a disability within the meaning of the ADA and cannot establish a disability discrimination claim.

Based on the foregoing, Ms. Dorleus' Charge is completely without merit. Therefore, Respondent respectfully requests that the Ms. Dorleus' charge be dismissed in its entirety.

Sincerely,

*Chase W. Ensign*

Chase W. Ensign

---

[3] Ms. Dorleus' claim that her leaders retaliated against her for requesting a leave of absence is further undermined by the fact that Comcast engaged fully in the ADA interactive process with Ms. Dorleus and approved her requests for accommodation.

COM:1131327v1

# EXHIBIT A

# Equal Employment Opportunity (EEO) Policy

Comcast's policy is to provide equal employment opportunities to, and prohibit discrimination against, all applicants and employees without regard to race, color, religion, creed, gender, gender identity or expression, age, national origin or ancestry, ethnicity, citizenship or immigration status, disability, sex, sexual orientation, marital status, pregnancy, veteran status, membership in the uniformed services, genetic information, or any other basis protected by applicable law ("protected characteristics"), which protections shall also cover the perception that an individual has a protected characteristic or associates with a person who has or is perceived as having a protected characteristic, to the extent required by law. This policy of equal opportunity covers all aspects of the employment relationship, including the application and hiring process, corrective action, promotion and transfer, selection for training opportunities, compensation, termination and the application of service, retirement and employee benefit plan policies. Consistent with this policy, Comcast is committed to making employment decisions based on merit, qualifications, business needs, and other job- related criteria without regard to an individual's actual or perceived protected characteristic(s).

Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated. Complaints brought under this policy are covered by the company's Anti-Retaliation Policy.

Employees working in Vermont should click here for state-specific information.

# Harassment Policy

Comcast is strongly committed to providing a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in an environment free of sexual harassment and other forms of unlawful harassment.

Accordingly, Comcast prohibits the harassment of its employees by other employees, managers, vendors, contractors, customers, and other third parties doing business with the company based on any protected characteristic (as defined in our EEO policy), including the perception that an individual has a protected characteristic or is associated with a person who has or is perceived as having a protected characteristic.

Harassment in violation of this policy may exist when an individual is subjected to unwelcome conduct, whether verbal, physical or visual, based on an actual, perceived or associational protected characteristic, and the conduct has the effect of unreasonably interfering with the individual's job performance or creating an intimidating, hostile or offensive work environment, is made either explicitly or implicitly a term or condition of employment, or where submission to such conduct is used as the basis for an employment decision.

Comcast's policy against harassment applies even when the underlying behavior is inappropriate or disruptive in the workplace, but does not rise to the level of harassment under the law. Behavior in violation of this policy may include: making epithets, slurs, ridiculing comments, or statements that reflect negative stereotyping; engaging in threatening, intimidating or hostile acts based on a protected characteristic; and/or displaying or transmitting written or graphic materials that denigrate or show hostility or aversion toward an individual or group (including through email or any electronic form) based on a protected characteristic.

In addition to the types of behavior listed above, inappropriate or harassing behavior of a sexual nature in violation of this policy may also include: making unwanted sexual advances; engaging in unwelcome visual, verbal, or physical conduct of a sexual nature, including touching, leering or making sexual gestures; requesting sexual favors; conditioning employment, a tangible job benefit, or an employment decision on submission to a sexual advance or favor; threatening or engaging in retaliation after a negative response to a sexual advance or request for sexual favors; asking out an individual when it is clear or after it becomes clear that the overture

is unwelcome; making sexually suggestive jokes, derogatory or sexually degrading comments, or comments about an individual's body or appearance; composing or transmitting sexually suggestive jokes, drawings, letters, or notes, whether by hand, electronically or otherwise; or displaying sexually suggestive objects, pictures, magazines, cartoons, posters, or other materials anywhere in the work place, including on a computer or other mobile device.

Behavior that is in violation of this policy is unacceptable in the workplace and in any work-related setting outside the workplace, such as business trips, business meetings, and business-related social events.

Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated. Confidentiality will be maintained during the investigation to the extent possible, given the need to investigate and/or take appropriate action in response to the complaint. Supervisors and managers also have an obligation to report any complaint or concern raised to them under this policy or any situation they observe that might violate this policy, even if the individual who raised the complaint or concern requests that it not be investigated or reported. Complaints brought under this policy are covered by the company's Anti-Retaliation Policy. *Employees working in New York state should review additional information pertaining to them, available here, and employees working in Delaware should review additional information pertaining to them here.*

# Reasonable Accommodation Policy

At times, qualified individuals with disabilities may need a reasonable accommodation in order to perform the essential functions of their position.



Comcast is ready and willing to discuss requests for reasonable accommodations that will enable an employee to perform his/her essential job functions. There are many forms of assistance that may be available to employees who may have such a need due to a disability. Comcast's practice is to engage in an interactive dialogue with an employee requiring assistance (and/or the employee's health care provider, as permitted by applicable law) in order to determine if and what kind of accommodation is needed.

If you need an accommodation, please contact either your Human Resources Representative or Sedgwick (Comcast's third party accommodations request administrator) at 855-473-7830 to initiate the interactive dialogue.

Employees working in the following states or cities should review additional specific information pertaining to them: Maryland, Illinois, Massachusetts, Washington, D.C., Philadelphia.

Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated. Complaints brought under this policy are covered by the company's Anti-Retaliation Policy.

# Anti-Retaliation Policy

Comcast strictly prohibits any form of retaliation against an employee who in good faith makes a complaint, raises a concern, provides information or otherwise assists in an investigation or proceeding regarding any conduct that he or she reasonably believes to be in violation of Comcast's Code of Conduct or policies (including, without limitation, the EEO Policy, Harassment Policy or Reasonable Accommodation Policy), or applicable laws, regulations or contracts. Comcast prohibits employees from being retaliated against even if their underlying complaint is eventually unsubstantiated, unless the employee knowingly made a maliciously false allegation, knowingly provided maliciously false or misleading information in the course of an investigation, or otherwise acted in bad faith.

This policy is designed to ensure that all employees feel comfortable speaking up when they see or suspect unlawful or unethical conduct (and/or when they participate in an investigation relating to such concerns) without fear of retaliation. No employee should be discharged, demoted, suspended, threatened, harassed, intimidated, coerced, or retaliated against in any other manner as a result of his or her making a good faith complaint (or assisting in the handling or investigation of a complaint).

Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated.

# Open Door Policy and Comcast NBCUniversal Listens Program

Comcast is committed to creating an environment where you feel comfortable speaking up without fear of retaliation. No matter the question or concern—whether it involves a workplace issue, a concern about suspected illegal or unethical conduct or any other matter—we want to hear from you.

Consistent with our Open Door Policy, we designed Comcast NBCUniversal Listens so you can be comfortable knowing that your concerns will be addressed appropriately and by the right people. The Comcast NBCUniversal Listens program includes a number of channels for raising workplace and integrity issues. Your supervisor is usually in the best position to resolve a concern quickly. If you are not comfortable raising a concern with your supervisor, you can talk to another local leader, any HR representative or a Comcast NBCUniversal Listens representative. You can also call the Helpline (1-877-40-LISTENS or 1-877-405-4783) or visit the Web Portal (www.ComcastNBCUniversalListens.com) to make a report. The Helpline and Web Portal are both managed by an independent third-party company, which allows you to remain anonymous if you choose.

The company cannot guarantee that an employee's concern will be resolved to his/her satisfaction. In each case, however, the company values the opportunity to hear your perspective and review the concerns raised.

Nothing in this or any other Comcast policy limits your ability to communicate with or provide information to any governmental agency or commission, including the Securities and Exchange Commission, regarding possible legal violations without disclosure to Comcast, as protected under whistleblower laws.

# Outside Employment

Comcast recognizes that employees may engage in employment and/or other activities outside of the company for many reasons.  While Comcast does not seek to interfere with the off-duty activities of its employees, employees have a responsibility to avoid any off-duty employment and/or activities which may interfere with the company's legitimate business interests. Therefore, except as otherwise protected by applicable law, employees should avoid outside employment and/or other outside activities that may create, or appear to create, a conflict with the company's interests, including such activities that:

- conflict with an employee's work schedule, duties, and responsibilities at Comcast;

- create a conflict of interest or are incompatible with the employee's position with Comcast;

- impair or have a detrimental effect on the employee's work performance with Comcast;

- require the employee to conduct work or related activities on Comcast's property, during the employee's working hours or to use Comcast facilities and/or equipment;

- draw on Comcast's proprietary, confidential or customer information; or

- directly or indirectly compete with the legitimate business or the interests of Comcast.

Employees who wish to work as an employee, consultant, advisor or officer or be a director of an outside for-profit business (including a family-owned business) must obtain pre-approval from their supervisor and an Authorized Approver under the Code of Conduct. Authorization to engage in outside employment can be revoked at any time.  Subject to applicable law, employees also must notify their supervisor in the event they plan to engage in outside employment during a leave of absence from the company.

# EXHIBIT B

is unwelcome; making sexually suggestive jokes, derogatory or sexually degrading comments, or comments about an individual's body or appearance; composing or transmitting sexually suggestive jokes, drawings, letters, or notes, whether by hand, electronically or otherwise; or displaying sexually suggestive objects, pictures, magazines, cartoons, posters, or other materials anywhere in the work place, including on a computer or other mobile device.

Behavior that is in violation of this policy is unacceptable in the workplace and in any work-related setting outside the workplace, such as business trips, business meetings, and business-related social events.

Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated. Confidentiality will be maintained during the investigation to the extent possible, given the need to investigate and/or take appropriate action in response to the complaint. Supervisors and managers also have an obligation to report any complaint or concern raised to them under this policy or any situation they observe that might violate this policy, even if the individual who raised the complaint or concern requests that it not be investigated or reported. Complaints brought under this policy are covered by the company's Anti-Retaliation Policy. *Employees working in New York state should review additional information pertaining to them, available here, and employees working in Delaware should review additional information pertaining to them here.*

# Reasonable Accommodation Policy

At times, qualified individuals with disabilities may need a reasonable accommodation in order to perform the essential functions of their position.

Comcast is ready and willing to discuss requests for reasonable accommodations that will enable an employee to perform his/her essential job functions. There are many forms of assistance that may be available to employees who may have such a need due to a disability. Comcast's practice is to engage in an interactive dialogue with an employee requiring assistance (and/or the employee's health care provider, as permitted by applicable law) in order to determine if and what kind of accommodation is needed.

If you need an accommodation, please contact either your Human Resources Representative or Sedgwick (Comcast's third party accommodations request administrator) at 855-473-7830 to initiate the interactive dialogue.

Employees working in the following states or cities should review additional specific information pertaining to them: Maryland, Illinois, Massachusetts, Washington, D.C., Philadelphia.

Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated. Complaints brought under this policy are covered by the company's Anti-Retaliation Policy.

# Anti-Retaliation Policy

Comcast strictly prohibits any form of retaliation against an employee who in good faith makes a complaint, raises a concern, provides information or otherwise assists in an investigation or proceeding regarding any conduct that he or she reasonably believes to be in violation of Comcast's Code of Conduct or policies (including, without limitation, the EEO Policy, Harassment Policy or Reasonable Accommodation Policy), or applicable laws, regulations or contracts. Comcast prohibits employees from being retaliated against even if their underlying complaint is eventually unsubstantiated, unless the employee knowingly made a maliciously false allegation, knowingly provided maliciously false or misleading information in the course of an investigation, or otherwise acted in bad faith.

This policy is designed to ensure that all employees feel comfortable speaking up when they see or suspect unlawful or unethical conduct (and/or when they participate in an investigation relating to such concerns) without fear of retaliation. No employee should be discharged, demoted, suspended, threatened, harassed, intimidated, coerced, or retaliated against in any other manner as a result of his or her making a good faith complaint (or assisting in good faith in the handling or investigation of a complaint).



# EXHIBIT C

is unwelcome; making sexually suggestive jokes, derogatory or sexually degrading comments, or comments about an individual's body or appearance; composing or transmitting sexually suggestive jokes, drawings, letters, or notes, whether by hand, electronically or otherwise; or displaying sexually suggestive objects, pictures, magazines, cartoons, posters, or other materials anywhere in the work place, including on a computer or other mobile device.

Behavior that is in violation of this policy is unacceptable in the workplace and in any work-related setting outside the workplace, such as business trips, business meetings, and business-related social events.

Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated. Confidentiality will be maintained during the investigation to the extent possible, given the need to investigate and/or take appropriate action in response to the complaint. Supervisors and managers also have an obligation to report any complaint or concern raised to them under this policy or any situation they observe that might violate this policy, even if the individual who raised the complaint or concern requests that it not be investigated or reported. Complaints brought under this policy are covered by the company's Anti-Retaliation Policy. *Employees working in New York state should review additional information pertaining to them, available here, and employees working in Delaware should review additional information pertaining to them here.*

## Reasonable Accommodation Policy

At times, qualified individuals with disabilities may need a reasonable accommodation in order to perform the essential functions of their position.



Comcast is ready and willing to discuss requests for reasonable accommodations that will enable an employee to perform his/her essential job functions. There are many forms of assistance that may be available to employees who may have such a need due to a disability. Comcast's practice is to engage in an interactive dialogue with an employee requiring assistance (and/or the employee's health care provider, as permitted by applicable law) in order to determine if and what kind of accommodation is needed.

If you need an accommodation, please contact either your Human Resources Representative or Sedgwick (Comcast's third party accommodations request administrator) at 855-473-7830 to initiate the interactive dialogue.

Employees working in the following states or cities should review additional specific information pertaining to them: Maryland, Illinois, Massachusetts, Washington, D.C., Philadelphia.

Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated. Complaints brought under this policy are covered by the company's Anti-Retaliation Policy.

## Anti-Retaliation Policy

Comcast strictly prohibits any form of retaliation against an employee who in good faith makes a complaint, raises a concern, provides information or otherwise assists in an investigation or proceeding regarding any conduct that he or she reasonably believes to be in violation of Comcast's Code of Conduct or policies (including, without limitation, the EEO Policy, Harassment Policy or Reasonable Accommodation Policy), or applicable laws, regulations or contracts. Comcast prohibits employees from being retaliated against even if their underlying complaint is eventually unsubstantiated, unless the employee knowingly made a maliciously false allegation, knowingly provided maliciously false or misleading information in the course of an investigation, or otherwise acted in bad faith.

This policy is designed to ensure that all employees feel comfortable speaking up when they see or suspect unlawful or unethical conduct (and/or when they participate in an investigation relating to such concerns) without fear of retaliation. No employee should be discharged, demoted, suspended, threatened, harassed, intimidated, coerced, or retaliated against in any other manner as a result of his or her making a good faith complaint (or assisting in good faith in the handling or investigation of a complaint).

Any complaint or concern about a possible violation of this policy should be reported to Human Resources and/or through one of the channels identified in the Open Door Policy (which includes avenues for anonymous reporting). Complaints will be promptly reviewed and, if appropriate, investigated.

# Open Door Policy and Comcast NBCUniversal Listens Program

Comcast is committed to creating an environment where you feel comfortable speaking up without fear of retaliation. No matter the question or concern—whether it involves a workplace issue, a concern about suspected illegal or unethical conduct or any other matter—we want to hear from you.

Consistent with our Open Door Policy, we designed Comcast NBCUniversal Listens so you can be comfortable knowing that your concerns will be addressed appropriately and by the right people. The Comcast NBCUniversal Listens program includes a number of channels for raising workplace and integrity issues. Your supervisor is usually in the best position to resolve a concern quickly. If you are not comfortable raising a concern with your supervisor, you can talk to another local leader, any HR representative or a Comcast NBCUniversal Listens representative. You can also call the Helpline (1-877-40-LISTENS or 1-877-405-4783) or visit the Web Portal (www.ComcastNBCUniversalListens.com) to make a report. The Helpline and Web Portal are both managed by an independent third-party company, which allows you to remain anonymous if you choose.

The company cannot guarantee that an employee's concern will be resolved to his/her satisfaction. In each case, however, the company values the opportunity to hear your perspective and review the concerns raised.

Nothing in this or any other Comcast policy limits your ability to communicate with or provide information to any governmental agency or commission, including the Securities and Exchange Commission, regarding possible legal violations without disclosure to Comcast, as protected under whistleblower laws.

# Outside Employment

Comcast recognizes that employees may engage in employment and/or other activities outside of the company for many reasons. While Comcast does not seek to interfere with the off-duty activities of its employees, employees have a responsibility to avoid any off-duty employment and/or activities which may interfere with the company's legitimate business interests. Therefore, except as otherwise protected by applicable law, employees should avoid outside employment and/or other outside activities that may create, or appear to create, a conflict with the company's interests, including such activities that:

- conflict with an employee's work schedule, duties, and responsibilities at Comcast;

- create a conflict of interest or are incompatible with the employee's position with Comcast;

- impair or have a detrimental effect on the employee's work performance with Comcast;

- require the employee to conduct work or related activities on Comcast's property, during the employee's working hours or to use Comcast facilities and/or equipment;

- draw on Comcast's proprietary, confidential or customer information; or

- directly or indirectly compete with the legitimate business or the interests of Comcast.

Employees who wish to work as an employee, consultant, advisor or officer or be a director of an outside-for-profit business (including a family-owned business) must obtain pre-approval from their supervisor and an Authorized Approver under the Code of Conduct. Authorization to engage in outside employment can be revoked at any time. Subject to applicable law, employees also must notify their supervisor in the event they plan to engage in outside employment during a leave of absence from the company.

# EXHIBIT D

# comcast.

# Job Description

| | |
|---|---|
| **Function** | Customer Service |
| **Family** | Customer Account Executives |
| **Job Title** | CE 2, Cust Exp Associate (Billing) |
| **Job Abbreviation** | CE2BILLING |
| **Hierarchy Group** | Support |
| **Hierarchy Level** | Support 2 |
| **FLSA** | Non-Exempt |

## Summary

Facilitates interactions with customers in a way that is in accordance with the Company's service delivery strategy. Establishes rapport and promotes effective relationships, upholding Comcast#s commitment to the customer experience through our Credo, Voice of the Customer (VOC) surveys, and the Comcast Customer Guarantee.

Responsible for accurately and confidently handling customer inquiries. Promotes Comcast products and services and makes recommendations that meet customer needs. Relates well to the customer, demonstrates favorable image of the Organization through effective use of soft skills (including active listening and problem solving skills), professional communications and internal/external customer interactions. Exercises sound judgment within the scope of their empowerment, and acts in the best interest of both the customer and company.

Employees at all levels are expect to:

- Understand our Operating Principles; make them the guidelines for how you do your job
- Own the customer experience - think and act in ways that put our customers first, give them seamless digital options at every touchpoint, and make them promoters of our products and services
- Know your stuff - be enthusiastic learners, users and advocates of our game-changing technology, products and services, especially our digital tools and experiences
- Win as a team - make big things happen by working together and being open to new ideas
- Be an active part of the Net Promoter System - a way of working that brings more employee and customer feedback into the company - by joining huddles, making call backs and helping us elevate opportunities to do better for our customers
- Drive results and growth
- Respect and promote inclusion and diversity
- Do what's right for each other, our customers, investors and our communities

## Core Responsibilities

- Demonstrates proficient skill in communicating and explaining account information to the customer with focus on first-call resolution. Must be able to accurately calculate and communicate taxes, fees, one-time charges, and/or recurring monthly fees. Exp

- Demonstrated ability to multitask between multiple tools and systems (knowledge base, team meetings, supervisor) and apply information and knowledge to customer

situations.

- Complies with company policies and procedures while applying sound judgment within scope of their empowerment and follows guidelines for Customer Proprietary Network Information (CPNI) and Personal Identifiable Information (PII).  - Accurately prepares

- Acts as a product consultant, articulating product features and benefits and making recommendations based on customer needs/interests; identifying buying signals and asking for the sale, reselling current value or right-size, delivering a quality custom

-Educates and promotes self service options.

- Proficient understanding of competitive environment and begins to position Comcast#s products positively to our customers.

- Demonstrated ability to work in a fast-paced, structured, dynamic and high-transaction environment.

-Proven ability to maintain composure in stressful situations, and manage and diffuse angry or upset customers.

- Consistently meets or exceeds established goals and performance metrics.

- Regular, consistent and punctual attendance. Must be able to work nights and weekends, variable schedule(s) and overtime as necessary.

- Attends training as required.

- Works independently, requiring minimal Supervisor support.

- Interacts with customers via telephone, e-mail, or face-to-face to assist with a variety of customer inquiries and issues. Must be able to wear telephone headset and manipulate objects such as pen, keyboard, and mouse.

- Other duties and responsibilities as assigned.

**Education Level**

- High School or Equivalent

**Field of Study**

-

**Certifications**

-

**Years of Experience**

- Generally requires 2-5 years related experience

**Compliance**

  Comcast is an EEO/AA/Drug Free Workplace.

**Disclaimer**

The above information has been designed to indicate the general nature and level of work performed by employees in this role.   It is not designed to contain or be interpreted as a comprehensive inventory of all duties, responsibilities and qualifications

# EXHIBIT E



**Comcast National Call Center Attendance Policy: Your Guide to Managing Life Inside and Outside of Work**

You play a critical role in the commitment Comcast has made to deliver a great customer experience. In order to keep our commitment to all our employees and customers, we rely on you to honor your work schedule and to be on time. We also understand that life happens outside of work and employees need to devote time to both areas.

To this end, Comcast has established the following attendance policy to help us strike the right balance between meeting customer needs at the highest level and providing employees work-life balance. Please read this document in full.

## OUR EXPECTATION TO ENSURE EXCELLENT CUSTOMER SERVICE

Please ensure you are familiar with our expectations and your responsibilities below:

- Arrive at your workstation and login into your phone systems, networks, and work applications promptly at the start of your shift. Please do not perform any work before the start of your shift.
- You should be ready to answer customer calls no more than 10 minutes after arriving at your workstation. During this "prep time" before you begin customer interaction, prepare to assist your first customer of the day by logging into the computer, opening work applications, retrieving and reviewing e-mails and voicemails, reading updates, reviewing job aids, and performing other work tasks.
    a) Prep time should not be used for any non-work activity.
    b) This prep time at the beginning of every shift should take no more than 10 minutes and is built into your productivity targets.
    c) Record all prep time as work time in the Employee Self Service System (ESS). If you are unable to complete your prep time in 10 minutes or less due to computer delays or other factors beyond your control, you should notify a supervisor.
- Log out of your phone and computer systems no earlier than 4 minutes before the end of your scheduled shift, and be sure to include the time it takes to log off your phone and computer systems as work time in ESS.
- Record all work time in ESS. You must not work "off the clock". During a scheduled meal period or rest break, you may not perform any work duties.
- if you are unable to be at work, you must follow the call-out procedure for your local call center, unless there are emergency circumstances related to the reason for calling out that prevent compliance.

## NEW HIRE INTRODUCTORY PERIOD (First 90 days of employment)

Reliable attendance is especially crucial during your new hire introductory period, and therefore, more heightened standards for attendance apply.  During this time, you will participate in a comprehensive training program to learn about the tools and resources needed to do your job. You will meet regularly with your leader to discuss attendance, conduct, and performance. The expectation is that you will be at work on time each day of your introductory period.

During the training and nesting periods, those using the On-Track performance management program (if applicable to your function) or another performance management system will receive corrective action issued as an Unscheduled Absence Points (UAPs). Agents receive UAPs for a number of reasons: arriving late, departing

COMCAST

early, unscheduled absences, no call no shows, and pattern behavior. Please see below for the associated number of UAPs for the new hire introductory period:

- 1 UAP = Written Warning
- 2 UAPs = Final Written Warning
- 3 UAPs = Termination

Leaders will partner with Human Resources (HR) when needed. Corrective action for attendance may be expedited if patterns of unacceptable attendance occur.

## HOW COMCAST HELPS YOU MANAGE ATTENDANCE

Following completion of your introductory period, we encourage you to schedule time off in advance whenever possible. However, we understand situations occur when you may not be able to plan in advance.

Review the chart below to learn about the different types of absences at Comcast:

| Type of Absence | PTO You Can Use | UAP Points | Additional Information |
|---|---|---|---|
| **Pre-scheduled and pre-approved time away from work** (e.g., vacations, appointments, time off to relax) | Flex, Floating Holiday, Vacation | No UAPs issued if paid time off is available | Flex, Floating Holiday, and Vacation are provided in accordance with our Traditional Time Off policy, which is outlined in the Employee Handbook. |
| **Unscheduled, Excused Absence** (e.g., emergencies, ill self/family) with Flex/Floating Holidays Available and leaves required by law (e.g., FMLA) | Flex, Floating Holiday (use only available time on the date you take off) | No UAPs issued if Flex and Floating Holiday time is available and the employee followed local call-out procedures. | You will not incur UAPs for unplanned absences (except for a No Call, No Show) if you use available Flex or Floating Holiday time and follow local call-out procedures. However, Flex and Floating Holidays may not be used to excuse a No Call, No Show. |
| **Unscheduled. Unexcused Absence with <u>no</u> Flex/Floating Holidays Available** | After you have exhausted your Flex and Floating Holidays, you will incur a UAP for any unscheduled absence even if you have Vacation time available. | Absent from 10 minutes to 50% of your shift will incur 0.5 UAP. Absent greater than 50% of your shift or more. You will incur 1.0 UAP. | You must use any available Traditional Time Off to get paid. |

COMCAST

| No Call, No Show | Failure to report an absence at any time before the end of a scheduled shift. | 3 UAP points per No Call, No Show | Three consecutive No Call, No Show days will be considered a voluntary resignation and will result in the termination of employment.  A No Call, No Show cannot be excused by using Flex, Floating Holidays, or Vacation time. |
|---|---|---|---|

Approved leaves of absence and other leaves required by federal, state or local time off laws (e.g., FML, ADA, state and local paid sick leave, Personal, Bereavement, etc.) are excused absences for purposes of this policy.  If you are taking leave intermittently (FML, ADA, paid sick leave or any other type of intermittent leave), you must still comply with local call-out procedures and designate the nature of your absence when calling out.

We encourage you to speak with your supervisor to discuss any questions you may have. We appreciate the commitment you show to the business by honoring your work schedule.

### WHAT HAPPENS IF YOU ACCUMULATE UAPs?

Unscheduled absences that are not excused will result in corrective action as set forth below:

- **Verbal Warning** = 1 UAP within a rolling backward 6 month period
- **Written Warning** = 2 UAPs within a rolling backward 6 month period or 1 additional UAP while on Verbal Warning
- **Final Written Warning** = 3 UAPs within a rolling backward 6 month period or 1 additional UAP while on Written Warning
- **Termination** = 4 UAPs within a rolling backward 6 month period or 1 additional UAP while on Final Written Warning

Please also note the following:

If time is not entered daily, employee will see a "Pending" UAP in the ESS dashboard:

- Employees are expected to enter time daily. Any unscheduled absence will display a "Pending" status UAP in the ESS dashboard
- UAPs in "Pending" status will not be counted against the employee during a (14) day period
- Once Flex/Float time is entered into ESS for an unscheduled absence, approved by the Supervisor/Admin Sup, the "Pending" UAP will be moved to "**Waive Time Entered**" status
- If no available Flex/Float is entered into ESS during the (14) day period the UAP will move to an "Active" status and be counted against the employee's record. To correct the UAP the Supervisor/Admin Sup will need to make a correction manually in the MSS dashboard.
- If an employee does not have any Flex/Float time available the UAP will process as it does today and move to an "Active" UAP that is counted against the employee's record
- Consecutive days of unscheduled, unexcused absences normally will be treated as separate events.
- For a variety of reasons, there may be times when employees are not issued corrective action in the particular order set forth above.  The center's Site Director and local Human Resources Partner have the discretion to waive a UAP in extenuating circumstances when an employee is not able to come to work.  On the other hand, corrective action steps may be skipped if, in the opinion of management, abuse of this

COMCAST

policy or patterns of unacceptable attendance has occurred.  Patterns that may considered an abuse of this attendance policy include, for example, excessive tardiness.

- It is not possible to list every circumstance that may lead to corrective action for attendance related infractions.  Therefore, Comcast reserves the right to issue discipline for issues or infractions that may not be reflected in this policy.
- If an employee is in an inactive status during the valid period of a corrective action, the corrective action will be "frozen" until the employee returns to work.
- To be eligible for holiday pay on a company-observed holiday, you must work your scheduled shift (and any required overtime) and be on active status both on: (1) the last scheduled workday before the holiday, and (2) the first scheduled workday after the holiday, unless you are excused from work in accordance with local practice.

## RESOURCES FOR YOU

From Daycare referrals to Doctor On-Demand visits, Comcast has a variety of benefits you can leverage to balance work and life. Visit the Directory of Benefits by:

- Logging into "Comcast Now"
- Clicking "Benefits" under "Working for Comcast"
- Clicking "My Benefits Website"
- Clicking "Directory of Benefits"

*The Comcast National Call Center Attendance Policy may be amended or revised at any time with or without notice at the sole discretion of Comcast.*

# EXHIBIT F



## Call Out Policy

Employees are expected to be at work and on time every day as scheduled. When employees are unable to be at work, they must follow the call out procedures outlined in this policy. An employee's obligations under this policy are in addition to their obligations under the National Attendance Policy.

Employees arriving late, leaving early or reporting an unscheduled absence (collectively "unscheduled absences") must contact the following **within one hour prior to the start of their scheduled shift:**

- Their Direct Supervisor or Manager
- Resource Management: 877-60-ROC-60 (877-607-6260) – Effective beginning December 9, 2013

*Note: Employees who unexpectedly leave work early must notify their supervisor and Resource Management of their departure prior to leaving.

Employees missing consecutive days must continue to report their absences daily. All call outs need to be made by employees. Family members should not report absences for employees unless there is an emergency. In situations where a family member calls on behalf of the employee, the family member must provide a satisfactory explanation regarding why the employee was unable to call out. **Emails and texts are not an acceptable mode for communicating absences.**

If you receive the voicemail of the person you are trying to reach, the following information should be provided:
- Name
- Telephone number
- Reason for absence (e.g. sick, intermittent Family Medical Leave (including pending leaves), transportation issue)
- Estimated time of arrival

Failure to comply with this Call Out Policy will result in corrective action up to and including termination (separate and apart from any corrective action applicable under the National Attendance Policy).

This policy applies to all unscheduled absences for intermittent Family Medical Leave unless the employee is unable to comply with the procedures above due to an emergency or other extenuating circumstances relating to the leave. In such circumstances, the employee (or his/her family member) is expected to call out as soon as possible and provide the reason for the inability to comply. Employees on intermittent Family Medical Leave who do not comply with this policy and are unable to provide a satisfactory reason for their non-compliance may be denied intermittent Family Leave in addition to receiving corrective action as set forth above.

### *Call Out Policy*

*I have read and understand the Call Out Policy. I understand that Comcast may change or revise the Call Out Policy at any time in its sole discretion. If I have any questions about this policy, I will contact my HR representative.*

| | | |
|---|---|---|
| Employee Signature | 10373769 | 6|8|19 |
| | PERNR # | Date |

Revised December 5, 2013

**COMCAST**

### COMCAST CALL CENTER ATTENDANCE POLICY
### -ACKNOWLEDGEMENT-

I, *Suzarah Dorleus*, (print name) acknowledge receiving the updated Customer Care Attendance Policy (the "Attendance Policy"). I have read and understand the updated policy.

I understand that the Attendance Policy provides information concerning Comcast's expectations and my responsibilities as they relate to attendance.

I understand that Comcast may change or revise the Attendance Policy at any time in its sole discretion and without notice.

I understand that Comcast has provided me with up to 10 minutes of time after the start of my shift to prepare for my workday which may include a variety of duties such as retrieving, reading, and/or listening to work related emails or voicemails, logging into any needed systems and applications, reading updates, reviewing any job aids, updating my time sheet and any other work related tasks. This time allows me the opportunity to be at my desk at the start of the shift and fully prepared to assist my first customer. I understand that I am to properly record the preparation time as work time in the Employee Self Service System (ESS).

I understand that the Attendance Policy does not constitute an express contract of employment and does not guarantee employment for any specific period of time. I understand that my employment with Comcast is at will and that Comcast or I may end my employment at any time, for any reason and with or without notice.

_____
Employee Signature

_____
Date



## ACKNOWLEDGEMENT OF BUSINESS SERVICES TEAM EXPECTATIONS

*I have read and understand the policies and expectations outlined in the* Business Services Team Expectations *guide on pages 1 through 5 of this document.*

I understand that Management reserves the right to further define, supplement, or modify this policy as needed.

10373769

_____
**Employee Perner #**

Suzarah Dorleus

_____
**Employee Name (Printed)**

_____                 10/8/19
**Employee Signature**                                            **Date**

_____                 10/14/19
**Supervisor Signature**                                           **Date**

Updated 9/10/2018

# COMCAST BUSINESS CALL CENTER SCHEDULE ADHERENCE POLICY

## POLICY

Comcast is committed to providing a superior customer service experience to all of our customers. Employees play a critical role in the day-to-day operations because Comcast depends on employees to deliver this exceptional service. Comcast call centers are staffed and agents are scheduled according to the call arrival patterns so that we can be available for our customers when they call into our center. For these reasons, Comcast relies on employees to honor and adhere to their work schedules.

## WHAT IS THE SCHEDULE ADHERENCE SCHEDULE POLICY?

To ensure the needs of customers are met, Comcast has established the following policy for Comcast Business Care call centers. Three situations are covered in this Schedule Adherence Policy:

- Being up to 10 minutes late for the start of your shift. Anything 10 minutes or greater is covered under the Attendance Policy.
- Exceeding allotted time for lunch
- Logging out before the end of a shift.

Each tardy as defined above will result in an occurrence for the individual. Employees are allowed four occurrences in a fiscal month. If an employee has five such occurrences in a fiscal month the employee is subject to corrective action. Each fiscal the occurrence reset. If the employee get 5 occurrences each subsequence of 3 occurrences within the same fiscal month will result in the next level of corrective action being administered.

The occurrence counter resets at the beginning of each fiscal month and the first trigger will again be 5 to start or continue the corrective action process.

## WHAT EMPLOYEES CAN EXPECT FROM COMCAST

Employees are responsible for arriving at their workstation promptly at the start of their shift. They should not arrive at their workstations or perform any work before the start of their shift. Employees should log into computer networks, phone systems, and work applications as soon as they arrive at their workstation. In addition, employees should be ready to answer customer calls as soon as possible but no more than 10 minutes after arriving at their workstation. During this "prep time," employees should prepare to assist their first customer of the day by logging into the computer, opening work applications, retrieving and reviewing e-mails and voicemails, reading updates, reviewing job aids, and performing other work tasks. Prep time should not be used for any non-work activity. This prep time at the beginning of every shift should take no more than 10 minutes and is built into employees' productivity targets. Employees should record all prep time as work time in the Employee Self Service System (ESS).

_____
Employee's Signature

Date: 10|8|19

# EXHIBIT G

12/04/2019 WED 9:57 FAX                                                    ☑003/009

## Certification of Request for Reasonable Accommodation
Return this form by email to ComcastDocuments@SedgwickSIR.com or by fax to 855-464-2015
Form is due by 11/11/2019

Employee Name: Suzarah K. Dorleus
Claim #: 30193750130-0001

1.  Does the employee have a physical or mental impairment?   ☒ Yes   ☐ No
    If yes, please state the type of impairment:

    Shoulder dystocia, injury to brachial plexus at birth.

2.  Does the employee's impairment substantially limit any of the following major life activities:

    ☒ Working          __ Interacting with others   __ Seeing       __ Thinking
    __ Bending          __ Learning                   __ Self-Care    __ Walking
    __ Breathing        ☒ Lifting                     __ Sitting
    __ Concentrating    __ Performing manual tasks    __ Sleeping     ☒ Other (describe)
    __ Eating           ☒ Reaching                    __ Speaking        grasping
    __ Hearing          __ Reading                    __ Standing

    If no activities are checked, does the impairment affect any major bodily functions?   ☐ Yes   ☐ No

    N/A

3.  For each major life activity that is substantially limited by the impairment, please describe how the employee is
    restricted and *describe the limitations* (e.g. "Lifting – Cannot lift more than 10 lbs."):

    Working – may need breaks due to fatigue during the day. Up to 10min
    every 2hours.
    Lifting – no more than 3 lbs w/ left arm, for more than 1 minute
    Reaching – Limited range of motion, left arm, does not stretch completely
    (extend) straight!
    Grasping – Limited grasping ability, cannot hold more than 3lb for
    more than 1 minute.

4.  Is the expected duration of the above limitations known?  If yes, what is the expected duration of each limitation?

    as noted above.

5.  Please review the attached job description.  Does the employee's impairment limit his/her ability to do any of the job
    functions for the position and/or create a direct threat to the safety/health of the employee or others if he/she
    performs such functions?   ☐ Yes   ☒ No

    If yes, which job functions cannot be performed and/or create a direct threat?

6. Are there any reasonable accommodations that would enable the employee to perform the job duties of his/her position at this time without causing a direct threat?  ☒ Yes  ☐ No

   a. If *yes*, what accommodations (if any) are needed for the employee to perform his/her job duties at this time:

*Limit activity as in item #3.*

How long will these accommodations need to remain in effect?  *indefinite*

If breaks or intermittent absences are requested, please indicate both the <u>frequency</u> (*i.e.*, number per day, week, month, etc.) and <u>duration</u> of the breaks or absences needed:

     Frequency:  *each month*

     Duration:  *up to 4 days*

   b. If *no*, would the employee be able to work in *another position* at this time?  ☐ Yes  ☐ No

If yes, please describe what type of alternative position(s) the employee could perform: _____

*N/A*

7. If the employee is currently unable to work, with or without accommodations, when is he/she expected to be able to return to work?  *N/A*

   ☐ A return to work date cannot be determined and/or is unknown at this time.

Or:  Provide Return to Work Date (*please do not provide the date of the employee's next follow-up appointment; please provide your estimate of when the employee will be able to return to work*):

_____

8. If an estimated return to work date is provided in question 7 above, will any additional accommodations be needed for the employee to return to work on that date?  If yes, please describe the nature and expected duration of the accommodations needed.  *N/A*

9. Has the employee been <u>previously absent</u> from work (e.g., before the date this form is completed) due to his/her inability to work as a result of the condition?  Please indicate the specific date(s) that the employee was absent and unable to work.  *In 2019:*

Dates absent and unable to work:  *October 21, 28, 31 and November 4, 5, 6, 11th*

Signature: *[signature]*      Specialty: *FNP*      Date: *12/3/19*

Printed Name:  *Paul Reynolds*
Phone:  *303-337-6575*
Address:  *1360 Potomac St.  Aurora, CO 80012*

**Federal Genetic Information Nondiscrimination Act of 2008 (GINA)**

**California Genetic Information Nondiscrimination Act of 2011 (CalGINA)**

The Genetic Information Nondiscrimination Act of 2008 (GINA) and the California Genetic Information Nondiscrimination Act of 2011 (CalGINA) prohibit employers and other covered entities from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by applicable law. To comply with GINA and CalGINA, please be advised that you SHOULD NOT provide any genetic information when responding to a request for medical information, medical certification, medical release, medical opinion, etc.

"Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member of an embryo lawfully held by an individual or family member receiving assistive reproductive services. (75 Fed. Reg. 68934.)

"Genetic information," as defined by CalGINA means, with respect to any individual, information about any of the following:

(i) The individual's genetic tests;
(ii) The genetic tests of family members of the individual;
(iii) The manifestation of a disease or disorder in family members of the individual; and
(iv) Any request for, or receipt of, genetic services, or participation in clinical research that includes genetic services, by an individual or any family member of the individual.

"Genetic information" does not include information about the sex or age of any individual. (CA Govt. C. § 12926(g).)



12-4-2019                                        301937501300001                                        522019120401158

12/04/2019 WED 9:59 FAX                                                                              ☑006/009

## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION
## RE: REASONABLE ACCOMMODATION REQUEST

TO WHOM IT MAY CONCERN:

Please complete the highlighted sections below.

Pursuant to my request for reasonable accommodation under the Americans with Disabilities Act **and/or related state or local laws**, Comcast is conducting an inquiry to determine: 1) my eligibility for a reasonable accommodation; 2) if I am eligible, what reasonable accommodation, if any, would be appropriate; and 3) the feasibility of the reasonable accommodation.

Pursuant to, and consistent with HIPAA, 45 C.F.R. 164.508, **[and California's Medical Confidentiality Act, Civil Code section 56, et. seq.]**, I hereby authorize the release of any and all relevant medical information and records which relate to the physical or mental impairment that I am claiming substantially limits one or more major life activities so that such information may be evaluated in connection with my request for an accommodation.

(1)  *Name of specific health care provider(s) authorized to provide the information:*

| Provider Name | Provider Address | Provider Phone Number | Provider Fax Number |
|---|---|---|---|
| 1.) Paul Reynolds | 1360 S Potomac St | 303-337-8575 | 303-745-6264 |
| 2.) | | | |
| 3.) | | | |

(2)  *Name of employer or plan administrator authorized to receive and use the information in connection with the accommodation request:*
Sedgwick on behalf of Comcast and Comcast Clinical Director

Employee's Initials

12-4-2019      *C038147747-848-6172*   01937501300001

522019120401158B

12/04/2019 WED 10:00 FAX @007/009

## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION
## RE: REASONABLE ACCOMMODATION REQUEST

(3) *The information provided shall be used solely for the following purposes: approval/denial of leave; assessment, clarification and/or approval/denial of reasonable accommodations for employee's claimed disability; assessments of threats to the safety of employee or others; evaluation of employee's ability to perform essential functions of position with or without reasonable accommodations — therefore, I authorize the release of sufficient information, without disclosing my specific medical condition or diagnosis, to: (a) describe the nature, severity, and duration of my impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits my ability to perform certain activities and/or poses a threat to safety of myself or others; and (b) substantiates why the requested reasonable accommodation is needed.*

(4) *The information provided shall be discussed and shared on only an as-needed basis with appropriate personnel to consider my request for, and implementation of any, reasonable accommodation or related to the purposes outlined in paragraph (3) above;*

(5) *I hereby authorize Sedgwick or Comcast's Clinical Director to seek clarification of any information provided by my health care provider pursuant to this authorization.*

(6) *Neither this form nor any document related to my request for a reasonable accommodation shall be placed in my personnel file. All such documents shall be kept in a separate and secure medical file.*

(7) *This authorization shall remain valid for as long as the need for an accommodation remains necessary.*

(8) *Right to revoke: I understand that I have the right to revoke this authorization at any time by notifying Sedgwick (on behalf of itself and Comcast) in writing at P.O. Box 14566, Lexington, KY 40512-4566. I understand that the revocation is only effective after it is received and logged by **Sedgwick**. I understand that any use or disclosure made prior to the revocation under this authorization will not be affected by a revocation.*

(9) *I understand that after this information is disclosed, certain federal and/or state laws might not protect it.*



12-4-2019   \* C 0 3 8 1 4 7 4 7 . 8 4 8 - 6 1 7 2 \* 01937501300001

Employee's Initials: SD

522019120401158B

## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION
### RE: REASONABLE ACCOMMODATION REQUEST

*(10) I understand that I am entitled to receive a copy of this authorization.*

**By signing below, I hereby acknowledge and represent that I have read and understand the contents of this Authorization.**

Date: 12/3/19

Signature of Employee
(or Personal Representative)

Print Name: Suzarah Dorleus

*Personal Representatives:* _____

If a Personal Representative executes this form, that Representative warrants that he/she has the legal authority to sign this form on the basis of:

_____.

Claim Number: 30193750130-0001

Employee's Initials: 

12-4-2019    *C0381474788-6172*  30193750130001              522019120401159B

# EXHIBIT H

Sedgwick Claims Management Services, Inc.
PO BOX 14566
Lexington, KY 40512-4566



**sedgwick**

December 12, 2019

**Phone** 855-473-7830
**Fax**: 855-464-2015

Suzarah K. Dorleus
9888 E Vassar Dr Apt # H105
Denver, CO 80231

Re:     Comcast
        ADA Accommodation Request Approved
        Case Number: 30193750130-0001

Dear Ms. Dorleus:

Sedgwick assists Comcast with managing requests for reasonable accommodations.

Comcast is committed to providing reasonable accommodations to help qualified employees with a disability perform their essential job functions. As such, Comcast has reviewed your request, your medical information provided, as well as the information gathered during the interactive process.

Based on these reviews, Comcast has determined that your request for an accommodation is **approved**. The following accommodation will be provided:

1.  Occurrences on 11/06/2019 & 11/11/2019
2.  Intermittent medical leave of absence of 4 occurrences per month with each occurrence lasting up to 1 day: 12/03/2019-05/31/2020

**Please note that an individual occurrence includes arriving to work late, leaving work early, or an entire day's absence.**

*If applicable, any absence(s), due to your medical condition, which exceed your approved medical accommodation noted above may be counted as an unexcused absence and thus may be subject to discipline as set forth in the attendance policy, up to and including termination of employment. In addition, you are required to follow customary call-out procedures unless the nature of the absence does not allow you to comply. Finally, absences that are not applicable to this accommodation may be considered unexcused absences and subject to the attendance policy and disciplinary action up to and including termination of employment.*

**Please Be Advised:**
   **Paid Time Off:** If available, you will be required to use unused, accrued Paid Time Off (PTO) when you miss time from work (unless prohibited by state/local law) in the following pre-determined order: ATTB PTO, CA PTO Carryover, Flex, Floating Holiday, and Vacation. You are responsible for entering your PTO for an intermittent leave accommodation into ESS.

   **Periodic Updates:** While on leave you will be required to furnish periodic updates of your status and intent to return to work upon request to Sedgwick.



**Return to Work Information for Continuous Leaves only** : If and when you are released to return to work, you are required to submit a return to work release note from your treating provider, listing any restrictions/limitations and the anticipated duration of restrictions/limitations to Sedgwick, prior to return to work.  Please submit the return to work note to Sedgwick via fax at (855)464-2015 or email to: ComcastDocuments@Sedgwicksir.com.

**You may contact your local HR business partner to discuss next steps.**

**Please note, additional medical substantiation may be required if your accommodation is needed beyond the time period specified above.**

If you have any questions, require additional information, or experience a change in your circumstances which necessitates different or additional accommodation(s); please contact Sedgwick at 855-473-7830 Monday through Friday 7:00 a.m. - 8:30 p.m. Central Time.  You may also check the status of this request 24 hours a day, 7 days a week at: https://claimlookup.com/comcast.

Sincerely,

Kathleen Kerness Sloan
Job Accommodation Specialist



July 18, 2020

**VIA EMAIL**

Natalie Martinez

Colorado Civil Rights Division

1560 Broadway Street, Suite 825

Denver, CO 80202

natalie.martinez@state.co.us

      **Re:**    ***Suzarah Dorleus***

      ***CCRD Charge No. E2000007763***

      ***EEOC Charge 32A-2020-00267***

Ms. Martinez:

This response to Comcast Cable Communications Management, LLC's position statement is submitted on behalf of the claimant, Suzarah Dorleus in response to the above-referenced charge of discrimination filed by Suzarah Dorleus. Suzarah Dorleus worked for Comcast for about two-and-a-half months, starting on October 7th, 2019, and ending on December 17th, 2019. During the first week or so of training, Suzarah stumbled across an ergonomic worksheet on the employee portal and decided to fill it out in hopes of being able to do her job better as a result of her medical condition. After filling this form out, on October 14th, 2019, the Employee Operations Supervisor for the Human Resources Department ("Jennifer Reed") reached out to Suzarah via her work email to discuss the options that she had available to her. Suzarah was pulled out of training and was informed of the different "medical leaves" available to her as a trainee in the company.

It was in this meeting that Suzarah was informed about what was called "ADA Days". Suzarah was informed that because she was new, the only real accommodation that she could be provided was to take a maximum of 4 days off per month for her condition. Ms. Reed also informed Suzarah that she could start taking these days during training, provided that she and her doctor worked together to complete the forms that Sedgwick, the third-party company who

handles these requests, requires. Please note that had Suzarah not been pulled out of training and told that she could start taking ADA days, Suzarah would never have taken as many absences as she did. She did not ask for these days off— she simply requested a few ergonomic tools to help her maintain effectiveness. She was under the impression that her job cared about her physical health, so she was happy to take the days offered to her. To follow up with the conversation, Jennifer Reed sent Suzarah Dorleus an email with Sedgwick's contact information, as well as information on how to contact them. (See Exhibit A) Suzarah made sure to follow through with protocols and procedures outlined by Comcast when she took her ADA days. The absences that Comcast outlines in their position statement are ADA days that Suzarah was assured she could take without immediate penalty. Suzarah was constantly told by her supervisors that the disciplinary action forms were "living breathing documents that can always be amended." When Suzarah returned to training after the meeting, Dawna Williams stated that Suzarah should've come to her first before going to HR and that Dawna needs to be aware of what's going on with her trainees.

II.    Factual History

A.  Ms. Dorleus' Employment

Suzarah Dorleus was ready and willing to work the full 40 hours per week schedule at Comcast as a CAE 2, even though it meant she would be in pain at the end of the workday. Suzarah would not have been absent as many times as she was if she was not told directly by Jennifer Reed that she was able to start taking these ADA days during training. Suzarah was aware of the attendance policy but seeing as an HR representative explained that she was able to take these days off **during** the training period, she didn't question it. She also made sure to follow through with protocols regarding taking the ADA days because she did not want to run into any disciplinary action, which included calling the employee attendance line, and letting her trainer/supervisors know she wouldn't be in for the day. Suzarah was also actively working with Sedgwick and her health care provider to ensure that everything was being taken care of effectively and within Comcast's guidelines. There was an issue with the paperwork submitted by Suzarah's healthcare provider and she immediately opened up a new claim with Sedgwick. More recently, shortly after filing a harassment claim with Comcast against the trainer Dawna

Williams, Suzarah was called into a disciplinary meeting with Rob Albers, Senior Operations Manager, and Zachary Kelsay, Suzarah's supervisor on December 11th, 2019. Please note that this meeting was held a week after Suzarah's harassment investigation concluded (See Exhibit C) on December 3rd, 2019. Please note that Dawna made it clear several times during training that she and Rob were very close and had been for years.

Comcast claims in their response that they elected to waive any disciplinary decision until Suzarah Dorleus' claim was resolved, but this statement is absolutely false. This is far from what happened. In the disciplinary meeting with Rob and Zachary, Suzarah was informed that she was on "thin ice" due to her absences. Naturally, Suzarah was very confused seeing as she did the math on how many days she took, and she was informed that she could take up to 4 days per month during training. Despite trying to explain to Rob that there was a four-day request still pending with Sedgwick. When Suzarah asked what she had been approved for through Sedgwick, neither Rob nor Zachary could inform Suzarah on what accommodations she had been approved for. This was because the accommodation approval had not even come through yet. The approval from Sedgwick came through the day after the disciplinary meeting was held. (See Exhibit B) It felt very odd to her Suzarah that she was being reprimanded for absences, but none of her superiors could inform her as to what she was approved for. *See Equal Employment Opportunity Commission v. Wal-Mart Stores No. 17-cv-739-jdp.*

Comcast continues to state that they withheld any disciplinary action as the ADA claim was pending, but that, again is utterly false. Suzarah had received other disciplinary actions during her pending claims but was assured that they were "living, breathing documents that can always be amended". This time was clearly different. It felt malicious and Suzarah started to realize that the investigation into Dawna was probably the reason for this rushed decision. It was retaliation. For Comcast to say that they held off from any disciplinary action until they received the approval from Sedgwick is completely and utterly false. The meeting was held on December 11th, 2019, and the approval from Sedgwick came through on December 12th, 2019. After reviewing the approval document, Suzarah wanted to speak to her supervisor, Zachary Kelsay, about amending the disciplinary documents and points she incurred because she, in fact, was approved for 4 days off per month, which directly contradicted what was stated by Rob in the meeting the day before.

Zachary, Ms. Dorleus' supervisor, was away on military duty for the following 2 days, so Suzarah was unable to reach him. The absence on December 16th, 2019 was due to hospitalization for a viral infection that Suzarah had contracted. She fell ill over the weekend and hadn't been able to keep any solids or liquids down for two days. Not wanting to get her co-workers sick, Suzarah was admitted to the ER where she acquired a doctor's note (See Exhibit D) and kept in contact with Zachary to inform him that she'd be absent. Despite having a doctor's note stating that she could not return the work until the 17th of December 2019, Suzarah was still terminated. She received a termination letter from Comcast on December 18th, 2019 (See Exhibit E). After putting thought into the way she was treated by her employer both before and after making the harassment claim to the company, there was a clear difference in morale. It was clear that Comcast intended to put her out of work, despite being the ones to offer the ADA days and the fact that they did not wait for the approval from Sedgwick before finalizing disciplinary actions. *See EEOC v. The Home Depot/Home Depot, U.S.A, Inc., N.D. Ill.* Civil Action No. 17-cv-06990 (2017). These are the facts, and Comcast is claiming the opposite.

### B. Ms. Dorleus' Harassment Complaint about Dawna Williams

On November 20th, 2019, after suffering multiple comments about her medical condition in front of the whole class at the hands of her trainer, Dawna Williams, Suzarah decided to submit a complaint through Comcast Listens, an online portal where employees who were/witnessed harassment can submit complaints. She was tired of feeling alienated and humiliated for a condition in which she cannot change, so in order to avoid retaliation from Dawna's friends, the supervisors, Suzarah took the complaint online. There were three key instances in which Suzarah felt harassed by Ms. Williams. They are: that Ms. Williams: (1) commented on Ms. Dorleus' medical absences in front of the rest of the class; (2) touched Ms. Dorleus' knee to feel the fabric of her pants; (3) asked Ms. Dorleus "what are you doing" when Ms. Dorleus was stepping into her zipped jacket due to limited mobility.

Suzarah was not an active part of this investigation. After submitting the complaint, Suzarah spoke to Ms. Vargas for a few minutes over the phone. That was it. Comcast claims that Ms. Williams was not made aware of my underlying medical conditions and that she never made comments in front of the class. That statement is completely, utterly, and profoundly false. The

witness to these instances, Jannaye Pogue, is too afraid to come forward for fear of retaliation. Stated below are the events that Ms. Pogue was witness to:

Dawna Williams made several comments about Ms. Dorleus' medical condition in front of the training group, which made them uncomfortable. Ms. Williams would often comment on Ms. Dorleus' absences due to her medical condition in front of the class. Ms. Williams would also motion and gesture at her arm while making these comments. Ms. Dorleus felt ashamed and outcasted for taking the ADA days that were offered to her mainly because of Ms. Williams. These comments, while Comcast tries to deny/downplay them, were hurtful and detrimental to Suzarah's mental health. Despite all this, Ms. Dorleus continued to try to love her job and do the best job she possibly could.

At one point during training, Ms. Pogue and Ms. Dorleus were having lunch together when Ms. Williams came up and started commenting on the fabric that Ms. Dorleus' leggings were made out of. Ms. Williams proceeded to touch and squeeze Ms. Dorleus' knee and stated that she'd "never seen leggings made out of this material before." This made Ms. Dorleus and Ms. Pogue very uncomfortable. Ms. Dorleus felt stuck because she did not want to be rude to her superior, but she also did not want to be touched in that manner. It was highly inappropriate.

At the end of one workday where it snowed, Ms. Dorleus was putting her jacket on in a way that was easier for her (feet first) due to her medical condition. Ms. Williams abruptly asked, "what are you doing?" in front of the training class. Our supervisor, Zachary Kelsey, aware of Ms. Dorleus' condition, mentioned to Ms. Williams, aloud, that this method was easier for Ms. Dorleus to dress herself. The comments did not stop there. After being informed of why Ms. Dorleus was dressing herself this way, Ms. Williams proceeded to state "Well, I've never had to put my jacket on that way." There was no concern in Ms. Williams' tone or demeanor. Obviously upset and uncomfortable, Ms. Dorleus walked out of the room as it was time to go home for the day. *See Rhodes v. Comcast Cable Communications Management, LLC Civil Action No. GLR-14-1824.*

During one of our training breaks where most of us were still in the room, Ms. Williams asked Ms. Dorleus if there was something wrong with Ms. Dorleus' arm because Ms. Williams had noticed a few instances where Ms. Dorleus mainly relied on her right hand. Ms. Dorleus proceeded to explain that she suffered a congenital injury at birth, thus Ms. Williams was aware of Ms. Dorleus' medical condition. For Comcast to attempt to explain that Ms. Williams was not

aware of Ms. Dorleus' condition is profoundly deceptive and false in nature. Ms. Dorleus explained to Ms. Williams on several occasions that she suffered a birth injury which led her to become the way she is now in hopes that Ms. Williams will understand that she is not lazy and might do things differently than the rest of the class. The last thing Ms. Dorleus wanted to feel from a superior that she confided in was animosity, but that is exactly what happened. Ms. Vargas' investigation did not include the victim, other than a few minutes on the phone. How she could conclude that the comments Ms. Williams made were out of concern or fear that Ms. Dorleus was going to step over her jacket is beyond me. With Comcast's history of retaliation, it is not surprising the full story did not come out. *See EEOC v. Hat World, Inc. d/b/a Lids, et al., Civil Action No. 2:19-cv-00314-RBS-LRL.*

Comcast admits in their position statement that Ms. Williams touched the fabric on Ms. Dorleus' knee because she thought it was "cool". At no point is it acceptable for a trainer to touch on one of his/her trainees, no matter how "cool" the pattern or fabric of their pants are. Ms. Vargas became keen on other instances where Ms. Williams was not acting professionally and assigned Ms. Williams to receive some sort of training. It is inconceivable to think that a trainer with a history of being "too casual" and/or harassing her trainees is still allowed to be in charge of establishing the professional tone of the company. There will never be a circumstance in which this trainer's actions are deemed professional by minimal standards. *See EEOC v. Rainbow Tree LLC d/b/a Persian Room Fine Dining No. 2-19-CV-5047-PHX-CDB.*

## CLAIMAINT'S RESPONSE TO RESPONDENT'S POSITION

In this response, Ms. Dorleus has established patterns of neglect on part of Comcast LLC. The allegation was not only based upon the comments made by Dawna Williams. Comcast has attempted to downplay he comments made by the trainer, Dawna Williams, and lace it with the sheer falsity that Ms. Williams was not aware of Ms. Dorleus' underlying medical conditions, so there is no way that the comments she made could not be motivated by that fact. Again, this is completely false and so far removed from the truth. Ms. Dorleus has established many instances in which Ms. Williams was more than aware of the medical condition that Suzarah suffers from. Ms. Williams received coaching to improve her professionalism, thus admitting that Comcast is aware that they have unqualified and unprofessional trainers that they continue to let harass their

trainees. If the trainees come forward, they are retaliated against and the trainer just gets a slap on the wrist.

Comcast has attempted to explain, falsely, that they made every attempt to accommodate Ms. Dorleus and that she did not receive disciplinary actions until the claim was approved, but again, that statement is false. They would like you to believe that Ms. Dorleus' claims are baseless, but this response to their position statement proves otherwise. Please note that Comcast is not the one that approves the ADA requests, that is on part of Sedgwick.

Based on the foregoing, Comcast's response is lacking, full of falsities and holes, and does not depict the full picture of what went on while Ms. Dorleus was employed there.

Furthermore, the Claimant respectfully requests that Comcast Cable Communications Management, LLC, be prosecuted to the fullest extent of the law. Ms. Dorleus is seeking to recoup lost earnings from the date she was fired. In addition, Ms. Dorleus requestfully requests that the EEOC establishes a permanent injunction to prevent Comcast from failing to provide reasonable accommodations to future employees. Ms. Dorleus is also seeking damages for the harassment and humiliation she endured.

Sincerely,

Suzarah Dorleus

Suzarah K. Dorleus

# EXHIBIT A

**Dorleus, Suzarah** <Suzarah_Dorleus@comcast.com>
to me

Mon, Oct 14, 2019, 12:11 PM

**From:** Reed, Jennifer <Jennifer_Reed@cable.comcast.com>
**Sent:** Monday, October 14, 2019 11:31 AM
**To:** Dorleus, Suzarah <Suzarah_Dorleus@comcast.com>
**Subject:** Sedgwick ADA information

Hi Suzarah – per our conversation today...

Here are a few links to help with your Sedgwick ADA request. When you haven an ADA day you must still call the attendance line and then email your EOS sup directly after to let us know of the ADA day.

There is a link to see the Sedgwick website and their phone number is listed as well **1-855-473-7830. Option #4 and then Option #1**

Sedgwick Fax's: *1-855-464-2015 and 1-866-315-0607* Sedgwick's email for documents comcastdocument@Sedgwicklc.com

Here is the link to check your balances ⊗ https://eupsorax.cable.comcast.com/sedgwick/ it can be found under Comcast now/More/Sedgwick Via One and add it to your connections.

Please let me know if you have any additional questions.
Thanks,
Jen

Jennifer Reed
Employee Operations Supervisor
West Division Comcast Business
D: 303-643-2220
C: 303-565-6942
Jennifer_Reed@Cable.Comcast.Com

# EXHIBIT B

Sedgwick Claims Management Services, Inc.
PO BOX 14566
Lexington, KY 40512-4566



December 12, 2019

**Phone**: (855) 473-7830
**Fax**: (855) 464-2015

Suzarah K. Dorleus
9888 E Vassar Dr Apt # H105
Denver, CO 80231

Sedgwick Claims Management Services, Inc.
PO BOX 14566
Lexington, KY 40512-4566



**Phone:** 855-473-7830
**Fax:** 855-464-2015

December 12, 2019

Suzarah K. Dorleus
9888 E Vassar Dr Apt # H105
Denver, CO 80231

Re:     Comcast
        ADA Accommodation Request Approved
        Case Number: 30193750130-0001

Dear Ms. Dorleus:

Sedgwick assists Comcast with managing requests for reasonable accommodations.

Comcast is committed to providing reasonable accommodations to help qualified employees with a disability perform their essential job functions. As such, Comcast has reviewed your request, your medical information provided, as well as the information gathered during the interactive process.

Based on these reviews, Comcast has determined that your request for an accommodation is **approved**. The following accommodation will be provided:

1. Occurrences on 11/06/2019 & 11/11/2019
2. Intermittent medical leave of absence of 4 occurrences per month with each occurrence lasting up to 1 day: 12/03/2019-05/31/2020

**Please note that an individual occurrence includes arriving to work late, leaving work early, or an entire day's absence.**

*If applicable, any absence(s), due to your medical condition, which exceed your approved medical accommodation noted above may be counted as an unexcused absence and thus may be subject to discipline as set forth in the attendance policy, up to and including termination of employment. In addition, you are required to follow customary call-out procedures unless the nature of the absence does not allow you to comply. Finally, absences that are not applicable to this accommodation may be considered unexcused absences and subject to the attendance policy and disciplinary action up to and including termination of employment.*

<u>**Please Be Advised:**</u>
   **Paid Time Off:**  If available, you will be required to use unused, accrued Paid Time Off (PTO) when you miss time from work (unless prohibited by state/local law) in the following pre-determined order: ATTB PTO, CA PTO Carryover, Flex, Floating Holiday, and Vacation.  You are responsible for entering your PTO for an intermittent leave accommodation into ESS.

   **Periodic Updates:**   While on leave you will be required to furnish periodic updates of your status and intent to return to work upon request to Sedgwick.



**Return to Work Information for Continuous Leaves only** : If and when you are released to return to work, you are required to submit a return to work release note from your treating provider, listing any restrictions/limitations and the anticipated duration of restrictions/limitations to Sedgwick, prior to return to work.  Please submit the return to work note to Sedgwick via fax at (855)464-2015 or email to: ComcastDocuments@Sedgwicksir.com.

**You may contact your local HR business partner to discuss next steps.**

**Please note, additional medical substantiation may be required if your accommodation is needed beyond the time period specified above.**

If you have any questions, require additional information, or experience a change in your circumstances which necessitates different or additional accommodation(s); please contact Sedgwick at 855-473-7830 Monday through Friday 7:00 a.m. - 8:30 p.m. Central Time.  You may also check the status of this request 24 hours a day, 7 days a week at: https://claimlookup.com/comcast.

Sincerely,

Kathleen Kerness Sloan
Job Accommodation Specialist



**Employee Name:**   Suzarah K. Dorleus
**Claim Number:**    30193750130-0001

## Return to Work Release Form

**To Be Completed by Health Care Provider (Please Type or Print)**
Sedgwick, P.O. Box 14566, Lexington, KY 40512-4566
Telephone: (855) 473-7830 Facsimile: (855) 464-2015
Email: ComcastDocuments@Sedgwicksir.com

Employee:   Suzarah K. Dorleus

PERNR :   10373769

### TO BE COMPLETED BY THE HEALTHCARE PROVIDER:

**Employee may:**

_____ Return to work on _____ **(date)** without restrictions

_____ Return to work on _____ **(date)** with restrictions as indicated below through _____ **(date)**
If these restrictions cannot be accommodated, the employee is considered to be off work for the duration listed above.

*Please list restrictions or limitations below:*

_____

_____

_____

_____ Restrictions listed below are **PERMANENT**.

*Permanent Restrictions/Comments:*

_____

_____

_____

**Name of Health Care Provider:** _____   **Health Care Provider Phone:** _____

**Health Care Provider Signature:** _____   **Health Care Provider Fax:** _____

**Today's Date:** _____

GINA Statement:  The Genetic information Nondiscrimination Act (GINA) prohibits employers from requesting or requiring genetic information of employees or their family members.  In order to comply, we are asking that you not provide any genetic information when completing this request.

# EXHIBIT C

Sedgwick Claims Management Services, Inc.
PO BOX 14566
Lexington, KY 40512-4566




sedgwick.

November 04, 2019

**Phone: 855-473-7830**
**Fax: 855-464-2015**

Suzarah K. Dorleus
9888 E Vassar Dr Apt # H105
Denver, CO 80231

Re:      Comcast
         Request for Accommodation
         Medical Information Needed
         Case Number: 30193750130-0001

Dear Ms. Dorleus:

Sedgwick assists Comcast with managing requests for accommodations. The medical documentation to support your accommodation request is due on or before **11/11/2019**. As of the date of this letter, we have not received your completed Medical Information Request Form for Accommodation.

**What You Need To Do:**

1.  <u>**Request that your healthcare provider complete the Certification Request Form for Accommodation. Sedgwick must receive this form by 11/11/2019**</u>. Email the form to <u>ComcastDocuments@SedgwickSIR.com</u> or fax to 855-464-2015. Delay in submitting the form may result in a delay or denial of your request for an accommodation, as your request cannot be evaluated without this information. Failure to provide the requested medical information by the Medical Due Date may also result in the closure of your case.

**NOTE:** Failure to submit a completed Certification in a timely manner will result in a denial of the request for an accommodation.  If you are currently out from work/on a leave of absence, your failure to submit this form may also result in your period of absence being considered unexcused and will subject you to termination of employment by Comcast.

If you have any questions or require additional information, please contact Sedgwick at 855-473-7830 Monday through Friday 7:00 a.m. - 8:30 p.m. Central Time.  Information regarding your case status can be obtained 24 hours a day, 7 days a week at <u>https://claimlookup.com/comcast</u> .

Sincerely,

Kathleen Kerness Sloan
Job Accommodation Specialist

ENC: Certification of Request for Reasonable Accommodation



## Certification of Request for Reasonable Accommodation
**Return this form by email to ComcastDocuments@SedgwickSIR.com or by fax to 855-464-2015**
**Form is due by 11/11/2019**

**Employee Name:** Suzarah K. Dorleus
**Claim #:** 30193750130-0001

---

1. Does the employee have a physical or mental impairment?     ☐ Yes   ☐ No
   If *yes*, please state the type of impairment:

2. Does the employee's impairment substantially limit any of the following major life activities:

   | | | | |
   |---|---|---|---|
   | __ Working | __ Interacting with others | __ Seeing | __ Thinking |
   | __ Bending | __ Learning | __ Self-Care | __ Walking |
   | __ Breathing | __ Lifting | __ Sitting | |
   | __ Concentrating | __ Performing manual tasks | __ Sleeping | __ Other (describe) |
   | __ Eating | __ Reaching | __ Speaking | |
   | __ Hearing | __ Reading | __ Standing | |

   If no activities are checked, does the impairment affect any major bodily functions?     ☐ Yes   ☐ No

3. For each major life activity that is substantially limited by the impairment, please describe how the employee is restricted and *describe the limitations* (e.g. "Lifting – Cannot lift more than 10 lbs."):

4. Is the expected duration of the above limitations known?  If *yes*, what is the expected duration of each limitation?

5. Please review the attached job description.  Does the employee's impairment limit his/her ability to do any of the job functions for the position and/or create a direct threat to the safety/health of the employee or others if he/she performs such functions?  ☐ Yes   ☐ No

   If *yes*, which job functions cannot be performed and/or create a direct threat?



6. Are there any reasonable accommodations that would enable the employee to perform the job duties of his/her position at this time without causing a direct threat?  ☒ Yes  ☐ No

   a. If *yes*, what accommodations (if any) are needed for the employee to perform his/her job duties at this time:

   *Limit activity as in item #3*

   How long will these accommodations need to remain in effect?  *indefinite*

   If breaks or intermittent absences are requested, please indicate both the <u>frequency</u> (*i.e.,* number per day, week, month, etc.) and <u>duration</u> of the breaks or absences needed:

   Frequency:  *each month*

   Duration:  *up to 4 days*

   b. If *no*, would the employee be able to work in *another position* at this time?  ☐ Yes  ☐ No

   If yes, please describe what type of alternative position(s) the employee could perform:  _____
   *N/A*

7. If the employee is currently unable to work, with or without accommodations, when is he/she expected to be able to return to work?  *N/A*

   ☐ A return to work date cannot be determined and/or is unknown at this time.

   Or: Provide Return to Work Date (*please do not provide the date of the employee's next follow-up appointment; please provide your estimate of when the employee will be able to return to work*):

   _____

8. If an estimated return to work date is provided in question 7 above, will any additional accommodations be needed for the employee to return to work on that date?  If yes, please describe the nature and expected duration of the accommodations needed.  *N/A*

9. Has the employee been <u>previously absent</u> from work (e.g., before the date this form is completed) due to his/her inability to work as a result of the condition?  Please indicate the specific date(s) that the employee was absent and unable to work.

   *IN 2019:*
   Dates absent and unable to work:  *OCTOBER 21, 28, 31 AND NOVEMBER 4, 5, 6, 11TH*

   _____        *FNP*              *11/21/19*
   Signature                       Specialty            Date

   Printed Name:  *PAUL REYNOLDS*
   Phone:  *303-337-5575*
   Address:  *1360 POTOMAC ST AURORA CO 80012*

## Federal Genetic Information Nondiscrimination Act of 2008 (GINA)

## California Genetic Information Nondiscrimination Act of 2011 (CalGINA)

The Genetic Information Nondiscrimination Act of 2008 (GINA) and the California Genetic Information Nondiscrimination Act of 2011 (CalGINA) prohibit employers and other covered entities from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by applicable law. To comply with GINA and CalGINA, please be advised that you SHOULD NOT provide any genetic information when responding to a request for medical information, medical certification, medical release, medical opinion, etc.

"Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member of an embryo lawfully held by an individual or family member receiving assistive reproductive services. (75 Fed. Reg. 68934.)

"Genetic information," as defined by CalGINA means, with respect to any individual, information about any of the following:

(i) The individual's genetic tests;
(ii) The genetic tests of family members of the individual;
(iii) The manifestation of a disease or disorder in family members of the individual; and
(iv) Any request for, or receipt of, genetic services, or participation in clinical research that includes genetic services, by an individual or any family member of the individual.

"Genetic information" does not include information about the sex or age of any individual. (CA Govt. C. § 12926(g).)



## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION
## RE: REASONABLE ACCOMMODATION REQUEST

TO WHOM IT MAY CONCERN:

Please complete the highlighted sections below.

Pursuant to my request for reasonable accommodation under the Americans with Disabilities Act **and/or related state or local laws,** Comcast is conducting an inquiry to determine: 1) my eligibility for a reasonable accommodation; 2) if I am eligible, what reasonable accommodation, if any, would be appropriate; and 3) the feasibility of the reasonable accommodation.

Pursuant to, and consistent with HIPAA, 45 C.F.R. 164.508, **[and California's Medical Confidentiality Act, Civil Code section 56, et. seq.],** I hereby authorize the release of any and all relevant medical information and records which relate to the physical or mental impairment that I am claiming substantially limits one or more major life activities so that such information may be evaluated in connection with my request for an accommodation.

(1)  *Name of specific health care provider(s) authorized to provide the information:*

| Provider Name | Provider Address | Provider Phone Number | Provider Fax Number |
|---|---|---|---|
| 1.) | | | |
| 2.) | | | |
| 3.) | | | |

(2)  *Name of employer or plan administrator authorized to receive and use the information in connection with the accommodation request:*
Sedgwick on behalf of Comcast and Comcast Clinical Director

## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION
## RE: REASONABLE ACCOMMODATION REQUEST

(3)  *The information provided shall be used solely for the following purposes: approval/denial of leave; assessment, clarification and/or approval/denial of reasonable accommodations for employee's claimed disability; assessments of threats to the safety of employee or others; evaluation of employee's ability to perform essential functions of position with or without reasonable accommodations – therefore, I authorize the release of sufficient information, without disclosing my specific medical condition or diagnosis, to: (a) describe the nature, severity, and duration of my impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits my ability to perform certain activities and/or poses a threat to safety of myself or others; and (b) substantiates why the requested reasonable accommodation is needed.*

(4)  *The information provided shall be discussed and shared on only an as-needed basis with appropriate personnel to consider my request for, and implementation of any, reasonable accommodation or related to the purposes outlined in paragraph (3) above;*

(5)  *I hereby authorize Sedgwick or Comcast's Clinical Director to seek clarification of any information provided by my health care provider pursuant to this authorization.*

(6)  *Neither this form nor any document related to my request for a reasonable accommodation shall be placed in my personnel file. All such documents shall be kept in a separate and secure medical file.*

(7)  *This authorization shall remain valid for as long as the need for an accommodation remains necessary.*

(8)  *Right to revoke:  I understand that I have the right to revoke this authorization at any time by notifying Sedgwick (on behalf of itself and Comcast) in writing at P.O. Box 14566, Lexington, KY 40512-4566. I understand that the revocation is only effective after it is received and logged by **Sedgwick.** I understand that any use or disclosure made prior to the revocation under this authorization will not be affected by a revocation.*

(9)  *I understand that after this information is disclosed, certain federal and/or state laws might not protect it.*



## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION
## RE: REASONABLE ACCOMMODATION REQUEST

*(10) I understand that I am entitled to receive a copy of this authorization.*

**By signing below, I hereby acknowledge and represent that I have read and understand the contents of this Authorization.**

Date: _____

_____
Signature of Employee
(or Personal Representative)

Print Name: _____

***Personal Representatives:*** _____

If a Personal Representative executes this form, that Representative warrants that he/she has the legal authority to sign this form on the basis of:

_____.

Claim Number: 30193750130-0001

AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION
RE: REASONABLE ACCOMMODATION REQUEST

**Federal Genetic Information Nondiscrimination Act of 2008 (GINA)**
**California Genetic Information Nondiscrimination Act of 2011 (CalGINA)**

The Genetic Information Nondiscrimination Act of 2008 (GINA) and the California Genetic Information Nondiscrimination Act of 2011 (CalGINA) prohibit employers and other covered entities from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by applicable law. **To comply with GINA and CalGINA, please be advised that you SHOULD NOT provide any genetic information when responding to a request for medical information, medical certification, medical release, medical opinion, etc.**

"**Genetic information**," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member of an embryo lawfully held by an individual or family member receiving assistive reproductive services. (75 Fed. Reg. 68934.)

"**Genetic information**," as defined by CalGINA means, with respect to any individual, information about any of the following:

(i) The individual's genetic tests;
(ii) The genetic tests of family members of the individual;
(iii) The manifestation of a disease or disorder in family members of the individual; and
(iv) Any request for, or receipt of, genetic services, or participation in clinical research that includes genetic services, by an individual or any family member of the individual.

"Genetic information" does not include information about the sex or age of any individual. (CA Govt. C. § 12926(g).)

Employee's Initials:_____

# EXHIBIT D

The Medical Center of Aurora
Centennial Medical Plaza

NORTH CAMPUS
700 Potomac Street
Aurora, CO 80011
303.363.7200

RETURN TO WORK/SCHOOL INSTRUCTIONS

MAIN CAMPUS
1501 South Potomac Street
Aurora, CO 80012
303.695.2600

DORLEUS, SUZARAH KENISHAH
E4001U8O04A0    PRE ER
12/16/19  1622
PCP
DOB: 01/02/97    22
MR# E091381601

CENTENNIAL
14200 East Arapahoe Road
Englewood, CO 80112
303.699.3000
303.699.3182 Fax

Employee / Student may return to work/school : 12 | 17 | 2019

Employee / Student needs the following work / school limitations:

Was seen in ED today 12/16/2019

_____
Physician or Nurse

# EXHIBIT E



**COMCAST**

December 17, 2019

Suzarah Dorieus
9888 E Vassar Dr. 8H-105
Denver, CO 80231

Dear Suzarah,

This letter is to inform you that your employment with Comcast will terminate effective December 23, 2019. Today will be your last day worked and we will pay you for your scheduled hours through December 23, 2019. This action is being taken based on your violation of Comcast's National Attendance Policy.

Your regular pay for hours worked, including any unused and accrued vacation time, will be paid out. If you are currently enrolled in Comcast's health insurance benefits, coverage will continue through December 31, 2019. Beyond that date, your rights to continue coverage under COBRA will be provided to you in the mail under separate cover. If you have any questions, please feel free to contact me at meghan_williams@comcast.com or the Employee Service Center at 877-909-4748.

Sincerely,

Meghan Williams
HR Manager

I understand and acknowledge the above:

Suzarah Dorieus                                         12/18/19
Printed Employee Name          Employee Signature          Date





Suzanar Dorlous
625 E 19th Ave
Apt 2656
Denver, CO 80203

ATTN:

No

No PFT Data
1 2 2 4 X 9 0 A 0 3 0 2 6 0 6878
DEVICE: XLE02   Jan 16 11 24 32 2021
HIP 1 13 SATO 8485 US

No PFT Data
1 2 2 4 X 9 0 A 0 3 0 2 6 0 6878

No PFT Data
1 2 2 4 X 9 0 A 0 3 0 2 6 0 6878
DEVICE: XLE02
HIP 1 13 SATO 8485 US

Un
R
G

raj

olwell

Courthouse

Denver

80294 - 3589